THIRD DIVISION
August 4, 2010

1-09-0691

No. 1-09-0691

| | | |
|---|---|---|
| CHARLES F. CETERA AND ELIZABETH CETERA, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiffs-Appellants, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | |
| MARY DiFILIPPO, | ) | Honorable |
| | ) | Carol P. McCarthy, |
| Defendant-Appellee. | ) | Judge Presiding. |

JUSTICE QUINN delivered the opinion of the court:

Plaintiffs, Charles and Elizabeth Cetera, filed a lawsuit alleging medical negligence against defendant, Dr. Mary DiFilippo, claiming that defendant was negligent in the diagnosis and treatment of an infection that Charles sustained following coronary bypass surgery.[1] Following a trial, the jury returned a verdict in favor of defendant and against plaintiffs. Plaintiffs filed a posttrial motion requesting a new trial, which the circuit court denied. On appeal, plaintiffs contend that the circuit court abused its discretion in denying their posttrial motion for a new trial where the court committed reversible error by: (1) allowing the introduction of plaintiffs' expert Dr. Carl David Bakken's licensing reprimand into evidence; (2) allowing defendant's expert witnesses to present undisclosed opinion testimony; (3) barring

---

[1] Plaintiffs also filed a negligence claim against the hospital, Christ Hospital and Medical Center, which was dismissed prior to trial.

1-09-0691

plaintiffs from questioning Dr. John Andreoni, a treating physician, regarding his insurance coverage; (4) allowing cross-examination of plaintiffs' expert Dr. Rodger MacArthur concerning his proximate cause opinions relating to the hospital nursing staff's conduct and giving the long form of Illinois Pattern Jury Instructions, Civil, No. 12.04 (3d ed. 1989); (5) refusing plaintiffs' nonpattern loss of chance instruction; (6) giving arbitrary rulings pertaining to cumulative testimony and cross-examination; and (7) entering erroneous rulings throughout the trial that cumulatively could have affected the jury's verdict. For the following reasons, we affirm.

I. BACKGROUND

A. Medical Treatment

Plaintiff Charles Cetera was admitted to the hospital on October 27, 1998, as a 74-year-old male with complaints of chest pain. Charles was diagnosed with a heart attack due to three blocked arteries and underwent a surgery known as a coronary artery bypass graft (CABG). The CABG included the placement of a chest tube in the upper right portion of Charles's abdomen to allow for drainage of the chest after surgery. After the tube was removed, a wound remained on Charles's abdomen.

Following the CABG procedure, Dr. Rajesh Sehgal, Charles's cardiologist, determined that Charles's cardiac rhythm was normal. On November 3, 1998, Dr. Mariusz Gadula, Charles's attending physician, began planning Charles's discharge from the hospital. Charles's hospital chart indicated that he did "great" during physical therapy on that date. There was no indication that Charles's doctors observed any redness or issue with the chest tube wound on November 1, 2, or 3, 1998.

2

1-09-0691

On November 4, 1998, Dr. Mary DiFilippo was overseeing Charles's care while Dr. Gadula was away from the hospital. At 6:30 a.m., Dr. DiFilippo received a telephone call alerting her that Charles was hypotensive and constipated. Dr. DiFilippo ordered that Charles not be given his beta blocker medication and that he be given medication for his constipation. At 8:30 a.m., Dr. DiFilippo examined Charles in his hospital room. Dr. DiFilippo observed that Charles had erythema, or redness, in the upper right quadrant of his abdomen, around the chest tube wound. Dr. DiFilippo observed that the erythema was "minor" and limited to a two-inch, "light pink" area around the wound and that Charles had some tenderness and swelling around the wound. Charles complained of pain around the wound, but was unable to explain if the pain was constant or intermittent. Dr. DiFilippo also examined Charles's liver, blood pressure, heart and extremities.

After examining Charles, Dr. DiFilippo's impression was that Charles had cellulitis in the upper right quadrant of his abdomen and low blood pressure. Dr. DiFilippo also considered whether Charles had problems with his liver or gallbladder. Dr. DiFilippo ordered that 250 milligrams of the antibiotic Keflex be given to Charles four times per day to treat the cellulitis and that Charles's blood pressure medication be decreased. Dr. DiFilippo also ordered that Charles's cardiac surgeon check the chest tube wound and that Charles undergo a liver function test. Dr. DiFilippo did not order a complete blood count test because she already knew there was an infection and she did not order a culture because there was no drainage or any particular area that could have been cultured without puncturing the wound. Dr. DiFilippo did not consider calling an infectious disease consultation at that time because the wound was minor and she

3

wanted input from the cardiac surgeons.

Later, at 11:30 a.m., on November 4, 1998, Dr. Pappas, a cardiovascular surgeon, examined Charles and ordered an ultrasound of Charles's upper right quadrant. Dr. Pappas did not change Charles's Keflex medication or order an additional antibiotic. At 12:40 p.m., Dr. Cozy, a cardiologist, examined Charles and noted in Charles's medical chart that he was taking antibiotics. Dr. Cozy requested an infectious disease consultation but did not change the Keflex medication.

At 4:30 p.m., Dr. Gordon, a cardiac surgeon, examined Charles and diagnosed a chest wall infection. Dr. Gordon added the antibiotic vancomycin, which is used to treat methicillin-resistant staph aureus (MRSA) infections, to the prior order for Keflex. Dr. Gordon requested an infectious disease consultation but did not alter the Keflex medication. At 7 p.m., a nurse called Dr. DiFilippo to report that Charles was not eating well and Dr. DiFilippo ordered the nurses to provide a can of a nutritional supplement with Charles's meals.

At 1 a.m., on November 5, 1998, a nurse contacted Dr. DiFilippo to report that Charles had low blood pressure. Dr. DiFilippo ordered that Charles be immediately evaluated by the house staff at the hospital. Dr. Anita Ekambarm, a first-year resident, examined Charles and called Dr. DiFilippo at 2 a.m. Dr. Ekambarm reported that Charles had low blood pressure and that the erythema had spread to the lower right quadrant of his abdomen. The erythema was tender and Charles had an increased temperature. Dr. DiFilippo and Dr. Ekambarm's differential diagnosis was sepsis or a heart attack. A complete blood count (CBC) was ordered to determine if Charles was septic and intravenous fluids were ordered to treat his low blood pressure. Dr.

DiFilippo continued the Keflex and vancomycin.

At 4:30 a.m., a nurse observed that Charles's chest tube wound was open and had a bloody drainage. Dr. Ekambarm ordered a blood culture of the drainage. Dr. Ekambarm believed that she notified Dr. DiFilippo of the drainage, but Dr. DiFilippo did not recall receiving a call regarding the drainage.

At 9:05 a.m., on November 5, 1998, Dr. Gadula examined Charles after his return to the hospital. Prior to the examination, Dr. Gadula discussed Charles's care with Dr. DiFilippo in preparation for resuming his care of Charles. Dr. Gadula noted that Charles had abdominal pain, he was slightly lethargic and weak, had mild nausea with no vomit or diarrhea, and his blood pressure was in the 95 range. Dr. Gadula's impression was that Charles had a possible chest wall infection extending from the chest tube wound. Dr. Gadula noted that Charles had been on the antibiotics Keflex and vancomycin, and that an infectious disease consultation was pending. Dr. Gadula ordered intravenous fluids, a blood culture, a complete blood test, a urine analysis, and that Charles's vital signs be monitored. Dr. Gadula did not change the antibiotic medications.

At 9:30 a.m., Dr. Andreoni, an infectious disease consultant, examined Charles. Dr. Andreoni observed erythema on the right side of Charles's abdomen, which was spreading along his right flank. Dr. Andreoni noted that the erythema was tender, painful, and the skin was swollen. Dr. Andreoni's impression was cellulitis of the abdominal wall consistent with a strep or mixed flora infection. Dr. Andreoni ordered the Keflex be discontinued and that the broad spectrum antibiotic Unasyn be administered by IV every six hours, as soon as possible. Dr. Andreoni continued the vancomycin.

5

The same morning of November 5, 1998, Charles was also examined by his cardiologist, Dr. Sehgal. Dr. Sehgal noted that Charles had abdominal pain and an infection where the CABG was performed. Dr. Sehgal ordered a blood gas test, a CT scan of Charles's abdomen, a surgical consultation, and that Charles be transferred to the intensive care unit.

At 1:30 p.m., on November 5, 1998, Dr. Gerald Klompien, a general surgeon, examined Charles and observed that Charles had a spreading cellulitis over the right abdominal wall. Dr. Klompien noted that he did not see crepitation, or gas, in the infected tissue, which would evince dying tissue. Dr. Klompien did not take Charles to surgery immediately because he did not find any crepitation, Charles appeared stable, and had just been started on IV antibiotics.

Around midnight on November 5, 1998, Dr. Klompien took Charles to surgery to oxygenate the infected tissue. During surgery, Dr. Klompien encountered a thin, watery fluid and healthy muscle with the fat above it bleeding, which was a positive sign that a blood supply remained, allowing antibiotics to get to the tissue. Dr. Klompien diagnosed Charles with necrotizing fasciitis.

On November 7, 1998, Charles underwent a second skin surgery to remove more tissue from the abdomen that had died after the first surgery. Charles's infection continued to spread and he underwent a third surgery on November 9, 1998, to remove tissue from his right flank, upper right leg, groin, and chest.

On November 10, 1998, Dr. Riccardo Izquierdo, a plastic surgeon, performed a more aggressive surgery to remove all of the necrotic tissue plus an additional two to three centimeters of healthy tissue in order to stop the infection. Dr. Izquierdo removed portions of the fat, muscle

and fascia in the right groin, right upper leg, the buttock, and the back. On November 21, 1998, Dr. Izquierdo performed surgery to take skin from Charles's thighs and graft the skin to his open wounds.

### B. Plaintiffs' Experts

At trial, plaintiffs called Dr. Carl David Bakken to testify, as a physician specializing in internal medicine and infectious diseases. Dr. Bakken testified that he reviewed Charles's medical charts, including Dr. DiFilippo's examination of Charles at 8:30 a.m. on November 4, 1998. Dr. Bakken disagreed with Dr. DiFilippo's diagnosis of mild cellulitis because of the location and redness combined with Charles's weakness, low blood pressure, and complaints of pain. Dr. Bakken testified that the standard of care required Dr. DiFilippo to order a complete blood count to determine if Charles's white blood count was elevated and to initiate appropriate broad spectrum intravenous antibiotics rather that a very small dose of oral Keflex. Dr. Bakken testified that Keflex is appropriate for treating cellulitis in a hospitalized patient to treat a minor infection, such as some redness of the finger or toe, where there are no signs of systematic infection. Dr. Bakken testified that Keflex is never appropriate for treating cellulitis appearing at the site of a five-day-old surgical wound. Dr. Bakken also testified that Dr. DiFilippo should have considered additional diagnoses, such as a drug rash and deeper tissue involvement.

In addition, Dr. Bakken criticized Dr. DiFilippo's differential diagnosis on November 5, 1998, after discussing Charles's condition with Dr. Ekambarm. Dr. Bakken testified that Charles's vital signs at 2 a.m. indicated that he was "quite sick" and he disagreed with Dr. DiFilippo's differential diagnosis of "sepsis versus heart attack." Rather, Dr. Bakken testified

that in his opinion, Charles had "evidence of a significant soft tissue infection which had spread to not only involve the great area of the right quadrant, but also involving the right lower quadrant of [Charles's] abdomen." Dr. Bakken opined that Dr. DiFilippo violated the standard of care by failing to recognize and diagnose a "systematic infection" and provide a differential diagnosis which included necrotizing fasciitis.

With regard to proximate causation, Dr. Bakken opined that, had Dr. DiFilippo recognized the severity of the infection on November 4, 1998, and ordered a broad spectrum intravenous antibiotic or contacted the infectious disease consultant, Charles would have lost significantly less tissue and required less surgery. Dr. Bakken testified that the infection could have been contained to the abdominal area with the proper diagnosis.

During recess of Dr. Bakken's direct examination, defendant advised the court of her intent to cross-examine Dr. Bakken regarding a reprimand he received on his license from the Illinois Department of Professional Responsibility pertaining to his misdiagnosis of a medical condition in a patient under his care. Plaintiffs responded that the reprimand had no relevance to this case where it did not relate to Dr. Bakken's credibility or ability to testify and the reprimand did not prevent him from practicing. Plaintiffs also suggested that the circuit court *voir dire* Dr. Bakken. The circuit court ruled that defendant would be allowed to ask Dr. Bakken if he had received the reprimand in question.

During cross-examination, Dr. Bakken admitted that in 2007, he received a letter of reprimand from the Illinois Department of Professional Regulation to his medical license for failing to diagnose microhematuria in a patient.

8

Dr. Rodger MacArthur, a medical doctor specializing in internal medicine and infectious diseases, also testified as plaintiffs' expert and provided opinions on the standard of care and causation. Dr. MacArthur opined that Keflex was not an appropriate antibiotic for Charles on November 4, 1998. Dr. MacArthur testified that Keflex was not appropriate because it does not cover the kind of organisms that are present in the hospital setting. Dr. MacArthur explained the differences between Keflex, which is an antibiotic given by mouth, and Unasyn, which is an IV antibiotic that delivers much higher levels of antibiotic to the blood and tissues. Dr. MacArthur testified that at 8:30 a.m., on November 4, 1998, Unasyn would have been the best antibiotic to give Charles, and had Unasyn been prescribed at that time, it would have slowed the spread of infection. Dr. MacArthur testified that the standard of care in 1998 required that an internist have basic knowledge of antibiotics, including the appropriate amount of drug concentration that would get into the serum, and the appropriate antibiotics to use for a postoperative surgical patient with a skin infection. Dr. MacArthur opined that Dr. DiFilippo deviated from the standard of care in this regard.

Dr. MacArthur testified that Charles would have developed necrotizing fasciitis by 4:30 a.m., on November 5, 1998. However, Dr. MacArthur's opinion was that if the right antibiotics had been given to Charles at either 8:30 a.m. on November 4, 1998, or at 4:30 a.m. on November 5, 1998, it could have slowed the spread of infection and limited it to Charles's abdominal wall. Dr. MacArthur also offered a proximate causation opinion that Charles lost a chance at a better outcome because he was given Keflex on the dates in question. Dr. MacArthur opined that Charles would have lost "substantially less tissue," experienced "substantially less scarring," and

needed "substantially fewer surgeries."

On cross-examination, Dr. MacArthur acknowledged that necrotizing fasciitis was present in Charles on the morning of November 4, 1998, when he was examined by Dr. DiFilippo. Dr. MacArthur also testified that necrotizing fasciitis and cellulitis have common symptoms such as redness and pain, but that necrotizing faciitis is uncommon and multiple surgical procedures for debridement are required to treat necrotizing fasciitis. Dr. MacArthur also testified, over plaintiff's objection, regarding his withdrawn opinion that nursing records indicated missed doses of intravenous antibiotics on November 5 and November 6, 1998. Dr. MacArthur testified that Unasyn was ordered at 10 a.m. on November 5, 1998, to be administered as soon as possible and every six hours. However, the first dose was not administered until 7 p.m. on November 5, 1998, and Charles did not receive a second or third dose of Unasyn. Dr. MacArthur testified that had Charles received a timely first, second, and third dose of Unasyn, the necrotizing fasciitis most likely would not have spread outside of his abdomen.

Elizabeth Cetera, Charles's wife, testified regarding the pain Charles endured following his many surgeries and his rehabilitation. Elizabeth also testified regarding how Charles' lifestyle and personality permanently changed after his surgeries.

### C. Defendant's Experts

Dr. DiFilippo testified that she was a board-certified doctor of internal medicine doctor. She testified that she retired from her medical practice in 2006. Dr. DiFilippo testified that cellulitis is a superficial skin and soft tissue infection that is fairly common. Dr. DiFilippo

testified that cellulitis typically requires antibiotic medication for treatment and it can take up to three days to stop the infection from progressing. Dr. DiFilippo testified that Keflex, Unasyn, and other antibiotics are appropriate to treat cellulitis in a hospital setting depending on the severity of the infection and the patient.

Dr. DiFilippo testified that on the morning of November 4, 1998, 250 milligrams of Keflex, four times a day, was an appropriate prescription for Charles's apparent cellulitis because the infection was mild and based on Charles's age and kidney function. Dr. DiFilippo opined that she followed the standard of care in treating Charles's infection which appeared as cellulitis on November 4, 1998. Dr. DiFilippo explained that strep and staph bacteria are the most common causes of cellulitis and that Keflex is used to treat those types of bacteria. Dr. DiFilippo testified that Charles's symptoms of low blood pressure, weakness, and chest pain were consistent with his recent cardiac surgery. She believed she met the standard of care in not changing the Keflex prescription where she evaluated Charles's overall condition and based on the fact that Charles was not toxic.

Dr. Mariusz Gadula testified that he is board certified in internal medicine and was Charles's treating physician during the relevant time period. Dr. Gadula testified that Keflex is a cephalosporin antibiotic that is "very good" for cellulitis skin infections and other infections caused by strep and staph bacteria. Dr. Gadula testified that strep and staph bacteria are the most common bacteria that would be expected to cause cellulitis near a chest tube wound. Dr. Gadula opined that Keflex was an appropriate medication to treat Charles's apparent cellulitis infection on November 4 and 5, 1998, and that Keflex is the medication used most often to treat such an

infection.

Dr. John Andreoni, a board-certified medical doctor specializing in infectious diseases, testified that he treated Charles in 1998. Dr. Andreoni explained that Charles had developed necrotizing fasciitis, which is an infection that occurs in the skin, soft tissue, and deeper layers of the skin. Dr. Andreoni further explained that necrotizing fasciitis destroys cells, requires multiple surgeries for treatment, and has a high mortality rate.

Dr. Andreoni testified that Keflex is an oral antibiotic that covers skin and soft tissue infections, including infections caused by E. coli bacteria. Dr. Andreoni testified that Keflex is commonly used in hospitals to treat cellulitis and his opinion was that it was appropriate for Dr. DiFilippo to prescribe 250 milligrams of Kefles four times per day to treat Charles' infection. Dr. Andreoni testified that a doctor should only treat a patient based upon what the doctor thinks is going on and avoid causing damage by overtreating a patient.

Dr. Andreoni testified that he was not critical of the doctors who treated Charles between the morning of November 4 and November 5, 1998, for not changing the Keflex prescription because the antibiotics must be given time to see if they will stop the infection. Dr. Andreoni testified that when he examined Charles at 9:30 a.m., on November 5, 1998, Keflex had not stopped the infection from spreading. As a result, it was time to change medications to account for other, less common bacteria.

Dr. Andreoni testified that Charles was diagnosed with necrotizing fasciitis after his first surgery. Dr. Andreoni testified that a culture later revealed that the infection was caused by E. coli bacteria that was moderately resistant to antibiotics. Dr. Andreoni testified that E. coli

bacteria was not a common cause of infections such as Charles's infection, but it did not change Charles's treatment. Dr. Andreoni explained that necrotizing fasciitis is treated by multiple surgeries to remove dead tissue and halt the spread of toxins that kill the tissue. Dr. Andreoni testified that antibiotic medication plays little role in this treatment and antibiotics alone would not have cured the necrotizing fasciitis. Dr. Andreoni opined that regardless of the strength or type of antibiotics prescribed to Charles, the antibiotics alone would not have been successful in combating the infection because surgical debridement is necessary to treat necrotizing fasciitis. Dr. Andreoni testified that Charles's course of treatment would have been the same even if he had been prescribed Unasyn on November 4, 1998, at 8:30 a.m., instead of Keflex.

Dr. John Sabbia, a board-certified general internist, testified as a retained expert on defendant's behalf. Dr. Sabbia explained that cellulitis is a superficial spreading infection of the skin that can develop around puncture wounds, such as Charles's chest tube wound. Dr. Sabbia opined that Dr. DiFilippo met the standard of care with respect to Charles's treatment on November 4, 1998, where Dr. DiFilippo took responsibility for his care, took a history, did an examination, made an impression of what was going on with the patient and treated him, and ordered other tests to differentiate what else might possibly be going on with the patient.

Dr. Sabbia testified that cellulitis was a reasonable diagnosis for a patient with a chest tube wound and Keflex was an appropriate antibiotic to treat cellulitis. Dr. Sabbia explained that cellulitis is typically caused by a staph or strep bacteria and Keflex is used to treat such bacteria. Dr. Sabbia testified that the 250-milligram dose of Keflex prescribed by Dr. DiFilippo was an appropriate dose, given Charles's weight, age, kidney and liver function. Dr. Sabbia testified that

it was appropriate for Dr. DiFilippo to order the cardiac surgeon to check Charles's wound because the surgeon who created the wound is primarily responsible to care for the wound. Dr. Sabbia also testified that it was appropriate for Dr. DiFilippo to order liver function tests and a hepatic panel to explore for gallbladder and liver problems. Dr. Sabbia opined that a CBC test was not needed because Dr. DiFilippo already knew there was an infection and an infectious disease consultation would have been premature given the small area of infection at the time.

With respect to Dr. DiFilippo's treatment of Charles on November 5, 1998, Dr. Sabbia opined that it was within the standard of care to consider a diagnosis of sepsis given the change in the patient and to order a blood culture and CBC test to rule it out. Dr. Sabbia testified that Dr. DiFilippo was not required to change the Keflex medication because a doctor has to give antibiotics a chance to work. Dr. Sabbia also testified that Dr. DiFilippo did not need to order an infectious disease consultation at that point because one had already been ordered.

Dr. John Flaherty, board certified in internal medicine and infectious diseases, testified as an expert for defendant. Dr. Flaherty testified that necrotizing fasciitis can sometimes present as cellulitis because the necrotizing fasciitis infection is deep in the tissue and the only outward signs of the infection are redness and swelling on the skin's surface. Dr. Flaherty explained that both cellulitis and necrotizing fasciitis can spread rapidly, but necrotizing fasciitis is a rare disease that requires multiple, aggressive debriding surgeries.

Dr. Flaherty testified that 90% of cellulitis infections are caused by staph or strep bacteria and that cellulitis was a proper diagnosis when Dr. DiFilippo examined Charles at 8:30 a.m., on November 4, 1998. Dr. Flaherty testified that Keflex was the most commonly used antibiotic to

treat cellulitis and the 250-milligram dose of Keflex was appropriate for an adult without a significant infection, who is older with an average body size and a lower kidney function. Dr. Flaherty opined that Charles's outcome would not have been different if Unasyn, rather than Keflex, had been prescribed at 8:30 a.m., on November 4, 1998. Dr. Flaherty explained that antibiotics would not have stopped the infection from progressing and surgical debridement was required.

Dr. Flaherty testified that on the morning of November 5, 1998, it was too early to know if the Keflex and vancomycin treatment was working. Dr. Flaherty explained that cellulitis commonly gets worse before it gets better and the antibiotics might need several days to work against the infection. Dr. Flaherty testified that the only hope to treat necrotizing fasciitis is to recognize it as early as possible and begin debriding surgeries. Dr. Flaherty testified that Charles was diagnosed with the necrotizing fasciitis infection following his first debriding surgery on November 6, 1998, and it was later determined that the infection was caused by E. coli bacteria. Dr. Flaherty opined that E. coli rarely causes cellulitis or necrotizing fasciitis.

Following closing arguments and deliberations, the jury returned a verdict in favor of defendant. In a written order, the circuit court denied plaintiffs' posttrial motion for a new trial. Plaintiffs now appeal.

## II. ANALYSIS

### A. Evidence of Dr. Bakken's Licensing Reprimand

Plaintiffs first contend that the circuit court committed reversible error when it allowed defendant to cross-examine Dr. Bakken concerning a reprimand on his medical license.

According to plaintiffs, this reprimand was inadmissible where Dr. Bakken had no restriction placed on his license and the reprimand was unrelated to his professional opinion.

Defendant initially argues that plaintiffs waived this issue for appeal by failing to object to the question about the reprimand itself and only interposing an objection after the answer was given and the defense asked the witness about the basis for the reprimand. The record shows that the following exchange occurred during Dr. Bakken's cross-examination:

"[DEFENSE COUNSEL]: Doctor, isn't it true last year your medical license to practice medicine was reprimanded by the State of Illinois?

[DR. BAKKEN]: There was a letter of reprimand issued because of a case that I was involved in, that's correct.

[DEFENSE COUNSEL]: And that reprimand was issued because you failed - -

[PLAINTIFF'S COUNSEL]: Objection.

[THE COURT]: Overruled.

[DEFENSE COUNSEL]: A reprimand was issued because you failed to recognize the presence of microhematuria in a patient, correct?

[PLAINTIFF'S COUNSEL]: Objection.

[THE COURT]: It's noted for the record.

[PLAINTIFF'S COUNSEL]: Judge, we do need a side bar.

[THE COURT]: No. You had 45 minutes on this. You may make your record later. The jury is going home at one hour and four minutes.

[DEFENSE COUNSEL]: I don't know that you answered that question, Doctor.

Did you receive that letter of reprimand from the State of Illinois, the Illinois Department of Professional Regulation for the failure to recognize the presence of microhematuria in a patient?

[DR. BAKKEN]: Yes."

Generally, a contemporaneous objection to the evidence at the time it is offered is required to preserve the issue for review. Simmons v. Garces, 198 Ill. 2d 541, 569 (2002). On the other hand, to save a question for review, an objection need not be repeated each time similar matters are presented where the court has previously ruled. Spyrka v. County of Cook, 366 Ill. App. 3d 156, 165 (2006). Once the court has ruled, a party is entitled to assume that the trial judge will continue to make the same ruling and that he need not repeat the objection. Spyrka, 366 Ill. App. 3d at 165.

In this case, during recess of Dr. Bakken's direct examination, defendant advised the circuit court of her intent to cross-examine Dr. Bakken regarding the reprimand from the Illinois Department of Professional Responsibility. Plaintiffs objected at that time and argued the evidence was irrelevant. The circuit court ruled that defendant would be allowed to ask Dr. Bakken whether he received a reprimand. Then during the cross-examination, the circuit court denied plaintiffs' request for a side bar regarding evidence of the reprimand and the court explained that plaintiffs had "45 minutes on this." The court concluded by telling plaintiffs to "make your record later." While plaintiffs did not make a further record after this exchange, based on this record, plaintiffs were entitled to conclude that the circuit court would continue to make the same ruling and were not required to repeat the objection.

17

1-09-0691

Turning to the merits, plaintiffs, relying on Creighton v. Thompson, 266 Ill. App. 3d 61 (1994), argue that the evidence of Dr. Bakken's reprimand was inadmissible to challenge his credibility because no restriction was placed on Dr. Bakken's practice.

The latitude afforded in cross-examination is within the discretion of the circuit court, reversible only for a clear abuse of discretion resulting in manifest prejudice to a party. Creighton, 266 Ill. App. 3d at 69. The principal safeguard against errant expert testimony is the opportunity of opposing counsel to cross-examine, which includes the opportunity to probe bias, partisanship, or financial interest. Creighton, 266 Ill. App. 3d at 69.

In Creighton, this court upheld the circuit court's determination, allowing the defendants to cross-examine the plaintiff's expert doctor concerning the current restrictions on his medical license at the time of his testimony. Creighton, 266 Ill. App. 3d at 69. In Creighton, the circuit court permitted the jury to be informed of two restrictions on the expert's medical license, namely, that the licensing agency could conduct announced and unannounced inspections of his practice and that a physician-proctor was to review periodically the doctor's patient records. Creighton, 266 Ill. App. 3d at 69. This court found the information highly relevant to the doctor's credibility because his expert testimony concerned "whether other physicians failed to exercise the appropriate standard of medical care during the precise time frame in which his home licensing authority required that his professional practices be audited." Creighton, 266 Ill. App. 3d at 69. This court also noted that the circuit court "carefully crafted" its ruling so that the jury would not be informed of the expert's criminal convictions or his history of disciplinary action. Creighton, 266 Ill. App. 3d at 69. Under these circumstances, this court concluded that

18

"any prejudice resultant to plaintiff's case was well warranted." Creighton, 266 Ill. App. 3d at 69.

In Creighton, this court also distinguished a prior opinion in O'Brien v. Meyer, 196 Ill. App. 3d 457 (1989). In O'Brien, the appellate court ruled that a medical expert could not be cross-examined about a previous failure to pass the Illinois licensing examination, since that information's prejudicial impact outweighed its scant probative value. O'Brien, 196 Ill. App. 3d at 464-65. In Creighton, this court distinguished O'Brien on the basis that, *after* securing his license, the medical expert's professional conduct was called into question and was thought to warrant continuing surveillance. Creighton, 266 Ill. App. 3d at 69-70. This court also distinguished Poole v. University of Chicago, 186 Ill. App. 3d 554 (1989), which held that reversal was required where the jury was informed of disciplinary proceedings pending against an expert. In Creighton, this court noted that no charges were pending against the expert, but rather his practices were already found sufficiently wanting so as to require professional oversight. Creighton, 266 Ill. App. 3d at 70.

Other jurisdictions have also held that a medical expert may be cross-examined with evidence of discipline affecting his or her medical license. See Richmond v. Longo, 27 Conn. App. 30, 34-40, 604 A.2d 374, 376-79 (1992) (holding that party should have been allowed to cross-examine physician expert with evidence that his license had been terminated due to his "mishandling" of cases); Whisenhunt v. Zammit, 86 N. C. App. 425, 358 S.E.2d 114 (1987) (suspension of physician expert's staff privileges from two hospitals was properly admitted to allow the jury to weigh the expert's testimony).

Here, plaintiffs maintain that, under <u>Creighton</u>, a physician expert can only be cross-examined regarding discipline if it resulted in a restriction on his or her practice. However, this court's decision in <u>Creighton</u> contains no such specific limitation. Rather, this court determined that the fact that the physician expert was unable to practice medicine without supervision was "highly relevant" to his credibility where his testimony pertained to whether other physicians failed to exercise the appropriate standard of medical care. <u>Creighton</u>, 266 Ill. App. 3d at 69.

Similarly, the jury in this case was informed that Dr. Bakken received a letter of reprimand from the licensing board for "the failure to recognize the presence of microhematuria in a patient." This information was relevant to Dr. Bakken's credibility because his testimony concerned whether Dr. DiFilippo exercised the appropriate standard of medical care during her treatment of Charles. Specifically, Dr. Bakken disagreed with Dr. DiFilippo's diagnosis on November 4, 1998, that Charles suffered from "mild cellulitis" at the site of his chest tube wound based on the fact that there was "redness accompanied by the patient feeling weak and complaining of pain and having low blood pressure." Dr. Bakken criticized Dr. DiFilippo for failing to conduct certain testing and consider additional diagnoses, such as the possibility of deeper tissue involvement. Dr. Bakken opined that Dr. DiFilippo violated the standard of care by failing to recognize and diagnose a "systematic infection" and provide a differential diagnosis which included necrotizing fasciitis. Dr. Bakken testified: "The standard of care required that Dr. DiFilippo at a minimum obtain a CBC, which is a complete blood count, to determine if the white count was elevated and the extent of elevation. And the standard of care also required that Dr. DiFilippo initiate appropriate broad spectrum intravenous antibiotics rather than a very small

dose of oral Keflex."

Plaintiffs assert that there was no relevant link between Dr. Bakken's failure to learn of microhematuria, or unseen blood in urine, and his opinion that Dr. DiFilippo should have considered the possibility of a more serious soft tissue infection and treated it with the appropriate antibiotics. However, the fact that the Illinois Department of Professional Regulation found it necessary to reprimand Dr. Bakken for the failure to recognize the presence of microhematuris reflects on Dr. Bakken's qualifications and had some tendency to lessen his credibility as an expert. See LaSalle Bank, N.A. v. C/HCA Development Corp., 384 Ill. App. 3d 806, 822 (2008) (relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence). Accordingly, we cannot say that the circuit court abused its discretion in allowing this evidence.

Furthermore, we note that "it is 'axiomatic that error in the exclusion or admission of evidence does not require reversal unless one party has been prejudiced or the result of the trial has been materially affected.' " Spaetzel v. Dillon, 393 Ill. App. 3d 806, 814 (2009), quoting Stricklin v. Chapman, 197 Ill. App. 3d 385, 388 (1990). Even if it were error to allow evidence of Dr. Bakken's reprimand, such error would be harmless where plaintiffs have not shown that the brief questioning permitted by the circuit court in this case caused prejudice to plaintiffs' case.

Plaintiffs further argue that they were prejudiced where the circuit court "rebuked" plaintiffs' counsel for requesting a sidebar during cross-examination of Dr. Bakken. While a trial

judge has the power to admonish or rebuke counsel for misconduct, any rebuke in the presence of the jury should not exceed the bounds of necessity and care must be taken even then to admonish in a manner which will not deprive either party of a fair trial. Lopez v. Northwestern Memorial Hospital, 375 Ill. App. 3d 637, 652 (2007). A new trial will be granted on the basis of a judge's remarks or conduct only if the remarks or conduct result in prejudice to a party. Lopez, 375 Ill. App. 3d at 652.

The record shows that after plaintiffs' counsel requested a sidebar, the circuit court reminded counsel that he already had sufficient time to make his arguments with respect to the evidence of Dr. Bakken's reprimand. The circuit court then suggested that counsel make a record for appeal and reminded counsel that the trial would proceed as scheduled. Therefore, the record shows that the circuit court's comments were brief and designed to move the trial forward by ending repetitious arguments. We cannot say that plaintiffs' case was prejudiced by the circuit court's brief comments in this respect.

### B. Expert Testimony of Drs. Flaherty and Andreoni

Plaintiffs next contend that the circuit court abused its discretion by allowing Dr. Flaherty, an expert for defendant, to render opinion testimony that had not been disclosed in answers to interrogatories, in violation of Supreme Court Rule 213 (210 Ill. 2d R. 213). Defendant responds that the testimony of Dr. Flaherty was appropriate and in compliance with Rule 213.

The decision of whether to admit or exclude evidence, including whether to allow an expert to present certain opinions, rests solely within the discretion of the trial court and will not

be disturbed absent an abuse of discretion. Spaetzel, 393 Ill. App. 3d at 812. An abuse of discretion occurs only if "no reasonable person would take the view adopted by the trial court." Dawdy v. Union Pacific R.R. Co., 207 Ill. 2d 167, 177 (2003).

The purpose of discovery rules, governing the "timely disclosure of expert witnesses, their opinions, and the bases for those opinions[,] is to avoid surprise and to discourage strategic gamesmanship." Thomas v. Johnson Controls, Inc., 344 Ill. App. 3d 1026, 1032 (2003). Supreme Court Rule 213 disclosures are mandatory and strict compliance is required. Spaetzel, 393 Ill. App. 3d at 812.

Rule 213(f)(3) requires parties to furnish, among other things, the subject matter, conclusions, and opinions of controlled expert witnesses who will testify at trial. 210 Ill. 2d R. 213(f)(3). Rule 213(g) limits expert opinions at trial to "[t]he information disclosed in answer to a Rule 213(f) interrogatory, or at deposition." 210 Ill. 2d R. 213(g). " 'A witness may elaborate on a disclosed opinion as long as the testimony states logical corollaries to the opinion rather than new reasons for it.' " Spaetzel, 393 Ill. App. 3d at 812, quoting Foley v. Fletcher, 361 Ill. App. 3d 39, 47 (2005).

In the present case, defendant, in her Rule 213 disclosures, stated in pertinent part:

"Dr. Flaherty is expected to testify consistent with his previous discovery deposition and with the records relating to Charles Cetera. In addition, it is anticipated that Dr. Flaherty will testify to the following opinions and conclusions based upon a reasonable degree of medical certainty, as well as any additional opinions disclosed during the course of his discovery deposition:

a. Dr. DiFilippo complied with the applicable standard of care in treating Charles Cetera at all times, including but not limited to during the time period of November 1998 through December 1998.

b. Dr. DiFilippo complied with the standard of care in regard to her treatment plan based upon her differential diagnosis, at the top of which was suspected cellulitis and she complied with the standard of care when she ordered the administration of Keflex to treat suspected cellulitis in a patient such as [Charles], which, prospectively, would have been most likely caused by strep or staph.

\*\*\*

d. Dr. Flaherty will testify that the timing of [Charles'] diagnoses of cellulitis and necrotizing fasciitis was appropriate and within the standard of care. Dr. Flaherty will testify that the timing and involvement of the consultants, including the infectious disease consultants were appropriate and within the standard of care.

\*\*\*

f. Dr. Flaherty will testify that the treatment of necrotizing fasciitis is a two-pronged approach, and that it cannot be stopped or slowed solely by the prescription of antibiotics, and that the definitive treatment of necrotizing fasciitis is surgery, and that it generally requires several surgical procedures before its progression can be halted. Dr. Flaherty will testify that necrotizing fasciitis has a high mortality rate. Further, he will testify that necrotizing fasciitis is a rare condition, and that necrotizing fasciitis in the trunk is even more rare. Dr. Flaherty will testify that necrotizing fasciitis has a

significantly higher mortality rate when the trunk is affected, as opposed to a limb."

During Dr. Flaherty's deposition he stated that, in forming his opinions, he reviewed "[t]he

progress notes, the surgical reports, the path reports, the lab results, the nursing notes, the

medications reports, [and] the x-ray reports." Dr. Flaherty also defined necrotizing fasciitis as "a

soft-tissue infection that travels along a fascial plane" and described the multiple debridement

surgical procedures that the infection typically requires. Dr. Flaherty further testified regarding

Dr. Klompien's surgical notes and that when Dr. Klompien indicated that he "removed

necrotizing fat," it indicated "necrotizing fasciitis."

Plaintiffs argue that the above Rule 213 disclosures, and Dr. Flaherty's deposition, were

not sufficient to place them on notice that he would provide testimony that: (1) described the

surgical techniques used during debridement and the necessity of the procedure; (2) described

how necrotizing fasciitis manifests itself, making it difficult to detect where it starts deep in the

tissue and the tissue may appear normal; (3) plaintiffs' demonstrative exhibit, showing the spread

of infection, was "a little bit misleading" because necrotizing fasciitis, unlike cellulitis, begins

deep in the fascia and changes at the surface occur later; (4) Dr. Klompien's surgical finding on

November 5, 1998, of abdominal wall fasciitis was "shorthand" for necrotizing fasciitis; and (5)

Charles's cardiologist's progress note on November 2, 1998, indicated possible postperi-

cardiotomy syndrome, which is common after open heart surgery and associated with fever and

chest pain.

Here, the record shows that during discovery, defendant disclosed the general opinions

that Dr. Flaherty would testify to. More specifically, in defendant's answers to interrogatories,

she stated that Dr. Flaherty would testify that "the timing of [Charles's] diagnoses of cellulitis and necrotizing fasciitis was appropriate and within the standard of care," "the definitive treatment of necrotizing fasciitis is surgery, and that it generally [] requires several surgical procedures before its progression can be halted," and that "necrotizing fasciitis is a rare condition *** [with] a higher mortality rate when the trunk is infected." Dr. Flaherty also testified in his depositions regarding the progression of necrotizing fasciitis, the surgeries required to halt the infection, and the surgical notes that he reviewed in this case. We find that the particular testimony at trial that plaintiffs complain of was permissible as an elaboration on, or a logical corollary to, Dr. Flaherty's originally revealed opinion. See Spaetzel, 393 Ill. App. 3d at 812-13. Therefore, the circuit court did not abuse its discretion when it allowed the testimony at issue. Moreover, even if this court were to find that the circuit court erred in allowing Dr. Flaherty's testimony, such error would not have required reversal as plaintiffs were unable to show prejudice. See Spaetzel, 393 Ill. App. 3d at 814.

Plaintiffs also argue that the circuit court abused its discretion in allowing Dr. Andreoni to provide trial testimony that had not been disclosed pursuant to Rule 213. Specifically, plaintiffs argue that they had no notice that Dr. Andreoni would testify that necrotizing fasciitis was a "toxin-mediated" infection, in which toxins emitted by bacteria kill the flesh and do not respond to antibiotics. However, Dr. Andreoni was one of Charles's treating physicians. A treating physician is considered a Rule 213(f)(2) independent expert witness. See 210 Ill. 2d R. 213(f)(2), Committee Comments, at 1xxxvi (" 'Independent expert witnesses' include persons such as *** a doctor who gives expert testimony based on the doctor's treatment of the plaintiff's

26

injuries").

Unlike a Rule 213(f)(3) controlled expert witness, the basis for a Rule 213(f)(2) independent expert witness's opinion need not be disclosed. Nedzvekas v. Fung, 374 Ill. App. 3d 618, 624 (2007). Rather, Rule 213(f)(2) requires only the disclosure of " 'the subjects on which the witness will testify and the opinions the party expects to elicit.' " Nedzvekas, 374 Ill. App. 3d at 624, quoting 210 Ill. 2d R. 213(f)(2). In this case, defendant disclosed that Dr. Andreoni would testify consistent with his discovery deposition and with Charles's medical records. In his discovery deposition, Dr. Andreoni testified regarding his treatment of Charles and opined that his treatment was within the standard of care. Dr. Andreoni also testified that the timing of the administering of antibiotics did not cause or contribute to any spread of infection. Dr. Andreoni specifically testified that necrotizing fasciitis requires surgery rather than antibiotics. We find that these disclosures were sufficient to comply with the requirements of Rule 213(f)(2).

### C. Evidence of Insurance Coverage

Plaintiffs next contend that the circuit court committed reversible error by precluding plaintiffs from introducing evidence of a common insurance carrier between Dr. Andreoni and defendant, Dr. DiFilippo.

As previously discussed, Dr. Andreoni, an infectious disease specialist, treated Charles during the time period in question. Dr. Andreoni was never a party to this case and was listed by both plaintiffs and defendant on their witness lists. At his evidence deposition, four days before closing arguments, plaintiffs attempted to question Dr. Andreoni about his insurance carrier and the manner in which he was appointed counsel. Dr. Andreoni refused to answer upon advise of

his attorney, Mr. Pinto. Plaintiffs argue that they had the right to solicit this information and that the circuit court erred in preventing plaintiffs' from hearing this testimony to show Dr. Andreoni's possible bias. Plaintiffs also argue that the circuit court further erred in striking their petition for rule to show cause against Mr. Pinto, requesting that he be held in contempt for obstructing justice in this matter or, alternatively, that the circuit court strike Dr. Andreoni's deposition testimony.

Defendant initially responds that plaintiffs waived this issue for review. The record reflects that prior to trial, defendant filed a motion *in limine* to bar any evidence of or reference to insurance. The circuit court granted this motion without any objection. A motion *in limine* is an interlocutory order and remains subject to reconsideration by the court throughout the trial. Krengiel v. Lissner Corp., 250 Ill. App. 3d 288, 294 (1993). However, the failure to raise an objection constitutes a waiver of the issue on appeal. Krengiel, 250 Ill. App. 3d at 294. Here, plaintiffs did not ask the circuit court to reconsider its ruling on the motion *in limine* until after the evidence deposition of Dr. Andreoni had already concluded. The issue is therefore forfeited for review.

Forfeiture aside, we find no error in the circuit court's ruling with respect to barring evidence of common insurance coverage between Dr. Andreoni and defendant. "Reference to the fact that defendant is protected by insurance or some other indemnity agreement ordinarily is improper and constitutes reversible error." Golden v. Kishwaukee Community Health Services Center, Inc., 269 Ill. App. 3d 37, 44 (1994). Exceptions have developed which allow introduction of the fact of insurance where it bears upon the credibility of a witness or an

28

impeaching statement. <u>Golden</u>, 269 Ill. App. 3d at 44.

In <u>Golden</u>, this court held that the circuit court's ruling with respect to barring the cross-examination of the defendant's medical experts as to their common membership in a medical malpractice insurance program was within the court's discretion, "particularly in the absence of any showing of how many mutual members are associated in the [insurance program] or any explanation of how or to what extent individual members would profit in the event of a favorable decision." <u>Golden</u>, 269 Ill. App. 3d at 44. However, this court held that the circuit court erroneously denied plaintiff the right to cross-examine one of the defendant's expert witnesses who had performed significant economic services for the insurer in reviewing claims against the insurer's doctor members to determine if those lawsuits would have had any impact on the insurance premiums the doctors pay. <u>Golden</u>, 269 Ill. App. 3d at 44. This court held that, with respect to this particular expert, "the possibility of some significant question of bias exceeding potential prejudice should have been recognized by the court in this instance." <u>Golden</u>, 269 Ill. App. 3d at 44.

Here, Dr. Andreoni was a treating physician rather than an expert retained by defendant. Moreover, plaintiffs failed to show any evidence that there was any commonality of insurance between Dr. Andreoni and Dr. DiFilippo or explain how or to what extent Dr. Andreoni would profit in the event of a favorable decision. Accordingly, the circuit court's ruling barring evidence of Dr. Andreoni's insurance coverage was within the court's discretion.

In addition, we find no error in the circuit court's stiking of plaintiffs' petition for rule to show cause requesting that Dr. Andreoni's attorney be held in contempt. Generally, civil

contempt occurs when a party fails to do something ordered by the trial court, resulting in the loss of a benefit or advantage to the opposing party. In re Marriage of Charous, 368 Ill. App. 3d 99, 107 (2006). Contempt that occurs outside the presence of the trial court is classified as indirect contempt. Marriage of Charous, 368 Ill. App. 3d at 107. The existence of an order of the trial court and proof of willful disobedience of that order is essential to any finding of indirect civil contempt. Marriage of Charous, 368 Ill. App. 3d at 107. The burden initially falls on the petitioner to prove by a preponderance of the evidence that the alleged contemnor has violated a court order. The burden then shifts to the alleged contemnor to show that noncompliance with the court's order was not willful or contumacious and that he or she had a valid excuse for failure to follow the court order. Marriage of Charous, 368 Ill. App. 3d at 107-08. Whether a party is guilty of indirect civil contempt is a question for the trial court, and its decision will not be disturbed on appeal unless it is against the manifest weight of the evidence or the record reflects an abuse of discretion. In re Marriage of Logston, 103 Ill. 2d 266, 286-87 (1984).

In this case, plaintiffs failed to cite any order by the circuit court that Mr. Pinto had violated during Dr. Andreoni's deposition testimony. Rather, the only apparent violation of any court order was by plaintiffs' attorney who attempted to question Dr. Andreoni about insurance matters, a topic prohibited by the circuit court.

### D. Cross-Examination of Dr. MacArthur

Plaintiffs next contend that the circuit court abused its discretion by allowing cross-examination of Dr. MacArthur's opinions of the proximate cause of the spread of Charles's

infection beyond his abdominal area. Over plaintiffs' objection, Dr. MacArthur opined that the failure of the nurses to provide the ordered antibiotics for nine hours after ordered and administering only one dose resulted in the spread of the infection beyond Charles's abdomen. Plaintiffs argue that this testimony, involving additional opinions that other parties no longer involved in the litigation proximately caused the injuries, was outside the scope of direct examination, irrelevant, and prejudicial.

Our supreme court's recent opinion in Nolan v. Weil-McLain, 233 Ill. 2d 416 (2009), is instructive. In Nolan, the plaintiff sued numerous corporations alleging that the decedent developed an asbestos-related disease after being negligently exposed to the defendants' asbestos-containing products during his 38-year career. The other 11 defendants either settled or were dismissed prior to trial, leaving Weil-McLain as the lone defendant in plaintiff's suit. Nolan, 233 Ill. 2d at 419. Weil-McLain filed a motion *in limine* to present evidence at trial that the sole proximate cause of the decedent's death was his exposure to asbestos-containing products of nonparty entities. The trial court denied the motion, barring Weil-McLain from introducing evidence of the decedent's other asbestos exposure. Our supreme court reversed and remanded for a new trial, holding that Weil-McLain should have been permitted to present evidence to establish that the conduct of another entity was the sole proximate cause of the decedent's injury. Nolan, 233 Ill. 2d at 433-44. The court, following its prior decision in Leonardi v. Loyola University of Chicago, 168 Ill. 2d 83, 93 (1995), found that it was reversible error to exclude the evidence when proximate cause was disputed and the defendant pursued a sole proximate cause defense. Nolan, 233 Ill. 2d at 440-41. The court also noted that there was

no special exception for certain types of tort cases, such as medical malpractice or asbestos-injury cases, and that the general principles of tort law set forth were universally applicable to all tort cases. Nolan, 233 Ill. 2d at 442-43.

In Leonardi, the plaintiffs' decedent suffered irreversible brain damage shortly after giving birth and died several years later. The plaintiffs filed a medical malpractice action against the hospital where she received treatment and against several physicians. Prior to trial, the decedent's attending physician died and his estate settled. Thereafter, the plaintiffs filed a motion *in limine* to bar evidence relating to the alleged negligence of any person other than the named defendants. The circuit court denied the motion and allowed the defendants to question several witnesses regarding the deceased attending physician's standard of care. The jury found in favor of defendants, and the appellate court affirmed. Leonardi, 168 Ill. 2d at 90-92.

Our supreme court found the trial court's order proper because the defendants in Leonardi "denied that they were even partly a proximate cause of plaintiffs' injuries" and pursued the theory that the decedent's treating physician was the sole proximate cause of the injuries. Leonardi, 168 Ill. 2d at 93. The court emphasized that "[i]n any negligence action, the plaintiff bears the burden of proving not only duty and breach of duty, but also that defendant proximately caused plaintiff's injury." Leonardi, 168 Ill. 2d at 93. The court explained that, under this analytical framework, a defendant "has the right not only to rebut evidence tending to show that defendant's acts are negligent and the proximate cause of claimed injuries," but also "has the right to endeavor to establish by competent evidence that the conduct of a third person, or some other causative factor, is the sole proximate cause of plaintiff's injuries." Leonardi, 168 Ill. 2d at

101. Accordingly, the court rejected the plaintiff's arguement that evidence of other possible causes for the claimed injury would confuse a jury or distract the jury's attention from the issue of whether a named defendant caused, wholly or partly, a plaintiff's injury. Leonardi, 168 Ill. 2d at 94. Rather, the court held that the "sole proximate cause defense merely focuses the attention of a properly instructed jury *** on the plaintiff's duty to prove that the defendant's conduct was a proximate cause of plaintiff's injury." Leonardi, 168 Ill. 2d at 94.

Here, pursuant to our supreme court's decisions in Nolan and Leonardi, we find that the circuit court properly permitted defendant to present evidence that the spread of Charles's infection was the result of another individual's conduct. Defendant denied that Charles was injured as a result of treatment he received under her care and, therefore, defendant was properly allowed to introduce testimony in support of her position that Charles's injury was the result of another cause. Specifically, Dr. MacArthur testified on direct examination that Charles lost a chance at a better outcome due to defendant's failure to prescribe the correct antibiotics on November 4 and the morning of November 5, 1998, which proximately caused Charles's infection to spread outside of his abdomen. Since defendant denied that she was even partly a cause of any injury, defendant was entitled to cross-examine Dr. MacArthur regarding his previously disclosed opinion that the failure by the nursing staff to administer the proper antibiotics to Charles after 10 a.m., on November 5, 1998, proximately caused the spread of the infection beyond Charles's abdomen.

Plaintiffs also argue that the circuit court committed reversible error by tendering to the jury an instruction on sole proximate cause.

A litigant has the right to have the jury clearly and fairly instructed upon each theory that was supported by the evidence. Leonardi, 168 Ill. 2d at 100. The question of what issues have been raised by the evidence is within the discretion of the trial court. The evidence may be slight; a reviewing court may not reweigh it or determine if it should lead to a particular conclusion. Leonardi, 168 Ill. 2d at 100. Our supreme court has explained, "The test in determining the propriety of tendered instructions is whether the jury was fairly, fully, and comprehensively informed as to the relevant principles, considering the instructions in their entirety." Leonardi, 168 Ill. 2d at 100.

Here, the circuit court tendered to the jury the long version of Illinois Pattern Jury Instructions, Civil, No. 12.04 (3 ed. 1989) (hereinafter IPI Civil 3d No. 12.04):

> "More than one person may be to blame for causing an injury. If you decide that a [the] defendant[s] was [were] negligent and that his [their] negligence was a proximate cause of injury to the plaintiff, it is not a defense that some third person who is not a party to the suit may also have been to blame.
>
> [However, if you decide that the sole proximate cause of injury to the plaintiff was the conduct of some person other than the defendant, then your verdict should be for the defendant.]"

Plaintiffs contend that the circuit court erred in tendering this instruction where there was "no evidence at trial *** to prove that a third party was solely responsible" for Charles's injuries. Rather, plaintiffs' assert, that defendant's experts testified to the contrary, that no earlier

medication would have changed the outcome of Charles's infection.

The record reflects that Dr. MacArthur testified that Charles failed to receive the antibiotic Unasyn on November 5, 1998, in a timely manner and that this failure caused the infection to spread beyond Charles's abdomen. This evidence could be judged the sole proximate cause of Charles's injury and, therefore, justify giving the instruction. Therefore, we cannot say that the court abused its discretion. Further, the fact that Dr. MacArthur's testimony may have been inconsistent with that of defendant's experts, who testified that no medication would have stopped the infection, is irrelevant. A party is entitled to present evidence and receive jury instructions on inconsistent, alternative legal theories. See Yoder v. Ferguson, 381 Ill. App. 3d 353, 383-84 (2008).

### E. Non-IPI Instruction

Plaintiffs next contend that the circuit court erred when it rejected their nonpattern jury instruction based on the lost chance doctrine under Holton v. Memorial Hospital, 176 Ill. 2d 95 (1997). Plaintiffs allege that refusal of their loss of chance instruction prevented plaintiffs from amplifying and clarifying their theory of causation where the proximate cause instruction, IPI Civil 3d No. 15.01, did not sufficiently instruct the jury. This court has consistently affirmed refusals of similar proffered nonstandard instructions because IPI Civil 3d No. 15.01 properly states the law in lost chance medical malpractice cases. See Sinclair v. Berlin, 325 Ill. App. 3d 458 (2001); Lambie v. Schneider, 305 Ill. App. 3d 421 (1999); Henry v. McKechnie, 298 Ill. App. 3d 268 (1998). In Sinclair, this court explained:

35

"[T]he trial court is required by Supreme Court Rule 239(a) (134 Ill. 2d R. 239(a)) to use the IPI instruction whenever it is applicable. [Citation.] Moreover, lost chance is not a separate theory of recovery but rather a concept that enters into proximate cause analysis in medical malpractice cases when a plaintiff alleges a defendant's negligent delay in diagnosis or treatment has lessened the effectiveness of treatment." Sinclair, 325 Ill. App. 3d at 466.

We find no reason to depart from our previous determinations and find no error in the circuit court's refusal of plaintiffs' nonstandard jury instruction.

### F. Cumulative Evidence

Plaintiffs next contend that the circuit court erred in the handling of cumulative evidence. Specifically, plaintiffs argue that the circuit court limited plaintiffs' opportunity to prevent testimony from Dr. MacArthur that was identical to plaintiffs' other expert Dr. Bakken, but the court arbitrarily allowed defendant to present testimony from Dr. Flaherty on the standard of care that was identical to that of Drs. Sabbia, Gadula, and Andreoni.

The trial court has discretion to limit the number of witnesses and may bar an expert from testifying if the expert's testimony would be cumulative. Kotvan v. Kirk, 321 Ill. App. 3d 733, 749 (2001). The trial court abuses its discretion when it improperly excludes evidence so as to deprive a party of a fair trial. Kotvan, 321 Ill. App. 3d at 749.

The record shows that Dr. Sabbia testified regarding the standard of care for a general internist. In contrast, Dr. Flaherty testified as an infectious disease specialist and offered

opinions on causation. Therefore, we cannot say that the circuit court abused its discretion in allowing the testimony from both of these experts. With respect to the testimony from Drs. Gadula and Andreoni, these doctors were Charles's treating physicians. This court has noted that treating physicians may render opinions at trial because " 'those opinions are developed in the course of treating the patient and completely apart from any litigation.' " Boatmen's National Bank of Belleville v. Martin, 223 Ill. App. 3d 740, 742 (1992), quoting Tzystuck v. Chicago Transit Authority, 124 Ill. 2d 226, 234 (1988). Thus, we find no abuse of discretion with respect to the admission of cumulative evidence. We further note that plaintiffs have failed to identify any exclusion of evidence that deprived them of a fair trial.

Plaintiffs also assert that the circuit court should have permitted them to re-cross-examine Dr. Andreoni about his statements pertaining to his obligation to follow a patient's care. The scope and extent of cross-examination and re-cross-examination are within the discretion of the trial court. Adams v. Sarah Bush Lincoln Health Center, 369 Ill. App. 3d 988, 998 (2007).

Plaintiffs object to the circuit court striking re-cross-examination testimony by Dr. Andreoni, stating that after examining Charles on November 5, 1998, he did not see Charles until November 6, 1998, following Charles's transfer to the intensive care unit and first debriding surgery. Plaintiffs argue that the circuit court should have allowed this re-cross-examination to challenge Dr. Andreoni's new testimony during redirect examination that suggested that he closely followed Charles's treatment. During redirect examination, Dr. Andreoni testified:

"Well normally, when I'm consulted on a patient, like I said as a routine, I find out what's going on besides reviewing all the records, and the laboratories and then going over the

history, if the patient is able to talk. And the exam is information from the nurses. I generally talk to the primary doctor ***.

Again, I don't have any specific recollections about that. But on patients that there's a concern where people raise concerns, I'm generally involved because I'm not someone who just comes and writes something and runs away. That's not the way you take care of patients."

A review of the record shows that, contrary to plaintiffs' assertion, Dr. Andreoni's testimony during redirect examination did not raise new material. Rather, Dr. Andreoni testified during direct examination that when he examined Charles on the morning of November 5, 1998, he reviewed the notes of the "various doctors and nurses that had seen [Charles] up until the time of [his] consult." Dr. Andreoni also testified during direct examination that he ordered that Keflex be discontinued, Unasyn be given as soon as possible, and that the erythema be marked because he wanted to "keep a close eye, keep a close monitor on what [was] going on." Dr. Andreoni further testified that after ordering the change in antibiotics, the next time he saw Charles was "after the surgery which was done early morning on the 6th [of November]." Therefore, we find no abuse of discretion where the circuit court limited re-cross-examination in this case to new material raised on redirect examination. See Johns-Manville Products Corp. v. Industrial Comm'n, 78 Ill. 2d 171, 181 (1980).

## G. Claim of Cumulative Error

Plaintiffs lastly contend that the cumulative effect of the circuit court's rulings denied them a fair trial. Plaintiffs argue that the medical evidence was closely balanced such that any

one of the court's errors could have tipped the scales in favor of defendant. As previously discussed, the evidentiary rulings made by the circuit court were either proper or well within the court's discretion. Where a movant fails to identify any evidentiary rulings which were either an abuse of discretion or error of law, logic necessarily dictates that a new trial is not required. See Favia v. Ford Motor Co., 381 Ill. App. 3d 809, 822 (2008). Reviewing courts are not concerned that parties receive an error-free trial; rather, our concern is that plaintiffs receive a fair trial, one free of substantial prejudice. Netto v. Goldenberg, 266 Ill. App. 3d 174, 184 (1994). A new trial is necessary when the cumulative effect of trial errors so deprives a party of a fair trial that the verdict might have been affected. Mueller v. Phar-Mor, Inc., 336 Ill. App. 3d 659, 670 (2000). Upon reviewing the record in this case, we cannot say that any cumulative effect exists in this case. Plaintiffs received a fair trial where they were free to present their case within the proper bounds set by the circuit court's rulings. Plaintiffs have failed to show that any error or multiple errors prejudiced their case such that a new trial is required.

### III. CONCLUSION

For the above reasons, we affirm the circuit court's determination denying plaintiffs' motion for a new trial.

Affirmed.

MURPHY, P.J., and COLEMAN, J., concur.

1-09-0691