2021 IL App (3d) 200015

Opinion filed January 29, 2021
_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| JOANNE C. GRETENCORD-SZOBAR, as | ) | Appeal from the Circuit Court |
| Special Administrator of the Estate of | ) | of the 13th Judicial Circuit, |
| Stephen A. Szobar Sr., Deceased, | ) | Grundy County, Illinois. |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | Appeal No. 3-20-0015 |
| | ) | Circuit No. 15-L-7 |
| JOSEPH E. KOKOSZKA, M.D,. and | ) | |
| ILLINOIS VALLEY SURGICAL | ) | |
| ASSOCIATES, S.C., | ) | |
| | ) | Honorable Lance R. Peterson, |
| Defendants-Appellees. | ) | Judge, Presiding. |

_____

JUSTICE SCHMIDT delivered the judgment of the court, with opinion.
Presiding Justice McDade and Justice Holdridge concurred in the judgment and opinion.

**OPINION**

¶ 1       Plaintiff, Joanne C. Gretencord-Szobar, appeals a jury verdict in favor of defendants,

Joseph E. Kokoszka, M.D., and Illinois Valley Surgical Associates, S.C. Plaintiff contends that

the trial court abused its discretion in instructing the jury. We affirm.

¶ 2                                  I. BACKGROUND

¶ 3       As special representative of her deceased husband, Stephen A. Szobar Sr., plaintiff brought

a medical malpractice action against defendants.

¶ 4     In her opening statement, plaintiff claimed that defendants were negligent in that Dr. Kokoszka, the consulting surgeon, failed to either (1) perform exploratory surgery to find the cause of Stephen's abdominal pain or (2) perform surgery to repair a possible small bowel obstruction identified by an X-ray on February 17.

¶ 5     In its opening statement, the defense argued that surgery was never indicated based on the diagnostic imaging or other testing. According to the defense, the potential small bowel obstruction could have been an ileus that could not be repaired by surgery. Also, the defense claimed that even if a small bowel obstruction existed that surgery could correct, Stephen's multisystem organ failure created such a high risk of death that surgery was contraindicated in this case.

¶ 6     At trial, the following evidence was adduced. On February 14, 2011, Stephen went to Morris Hospital with severe abdominal pain. Stephen was 77 years old at the time. Stephen's medical history included a prior heart attack, chemotherapy for incurable cancer (mantle cell lymphoma), congestive heart failure, chronic right pleural effusion, renal insufficiency, liver problems, obesity, anemia, and malnutrition.

¶ 7     On February 14, 2011, Stephen's primary care physician, Dr. Jennifer Jones, admitted Stephen to the hospital. Jones obtained cardiology, gastroenterology, surgery, pulmonology, nephrology, hematology, and oncology consults to assist her in managing Stephen's care.

¶ 8     Defendant, Dr. Joseph Kokoszka, a general surgeon, was not responsible for Stephen's overall care. Kokoszka's role was to determine whether surgery was indicated and whether surgery should be performed. Kokoszka worked with the other treating doctors in making this determination.

¶ 9     Kokoszka reviewed the CT scan performed the evening Stephen was admitted to the hospital. The CT scan showed a normal appendix, which ruled out appendicitis. The CT scan also

showed a polyp or mass in the ascending colon with a thickened terminal ileum. Lab tests showed poor kidney functioning.

¶ 10    On February 15, 2011, Dr. Jones examined Stephen. She noted lower quadrant abdominal pain and right pleural effusion.

¶ 11    On the same day, cardiologist Dr. Kirkeith Lertsburapa performed a cardiology consult on Stephen for his congestive heart failure, coronary artery disease, and tachycardia. Stephen suffered a heart attack in 2007. Stephen had chronic heart failure with a severely reduced pumping capacity of 20 to 25%, which leads to fluid buildup around the lungs. Stephen had an implanted ICD defibrillator device and a right coronary artery stent and was on aspirin and Plavix to avoid a future cardiac event.

¶ 12    Dr. Richard Rotnicki, a gastroenterologist, examined Stephen. Rotnicki noted acute abdominal tenderness in the lower right quadrant, but the abdomen was otherwise soft with normal bowel sounds. If Stephen was medically stable, Rotnicki planned to perform a colonoscopy the next day to investigate the mass or lesion in the ascending colon shown on the CT scan.

¶ 13    Defendant, Kokoszka, also examined Stephen on February 15. His exam revealed lower right quadrant abdominal pain without an obvious cause. There was no sign of peritonitis. The CT scan did not show evidence of an acute appendicitis or any inflammatory process. There was no indication for surgery.

¶ 14    Later that day, Stephen experienced atrial fibrillation (an arrhythmia or irregular heartbeat). Dr. Lertsburapa transferred Stephen to the ICU.

¶ 15    Dr. Rotnicki cancelled the February 16 colonoscopy because Stephen was not stable enough to undergo the procedure. Rotnicki examined Stephen daily. In addition to Stephen's

chronic heart, lung, and kidney problems, Stephen developed acute respiratory failure and liver failure. Stephen was never stable enough to undergo a colonoscopy.

¶ 16         Additional X-rays, ultrasounds, and blood tests were performed to identify the cause of Stephen's upper and lower right abdominal pain. The chest X-ray showed worsening pleural effusion. Stephen was prescribed a broad-spectrum antibiotic to fight any potential infection. Stephen's abdominal pain could be referred pain from his right lung pleural effusion.

¶ 17         On February 17, Stephen's kidney function worsened. The nephrologist planned to start dialysis to clear toxins from Stephen's blood. Kokoszka examined Stephen and ordered further X-rays while awaiting the dialysis.

¶ 18         On February 17, the radiologist's impressions of Stephen's chest X-rays stated, "suggestive of a mid to distal small bowel obstruction." Kokoszka ordered another X-ray for the next morning.

¶ 19         On February 18, Kokoszka examined Stephen again. Stephen's abdomen was soft, and he did not report any pain. X-rays taken that day did not show any significant change. Kokoszka and Rotnicki believed the possible bowel obstruction on the X-rays was an ileus rather than an obstruction. An obstruction exists where the bowel is blocked, usually mechanically. An ileus is a condition where the small bowel spasms, causing paralysis that prevents the flow of fluids and material through the bowel. Surgery is not performed on an ileus, as it would worsen the condition.

¶ 20         According to Kokoszka, a nasogastric tube was inserted to treat the small bowel obstruction or ileus. There was no consideration for surgery at that time, as a small bowel obstruction is not operated on emergently and surgery would not fix an ileus.

¶ 21         Kokoszka further testified that there was never an indication for surgery at any time during Stephen's hospitalization. Kokoszka explained that there must be a reason to perform surgery,

such as a condition to repair, in order to subject someone in Stephen's condition to the risk of surgery. Kokoszka explained:

"If surgery was necessary, we would discuss it, but there was no indication to do surgery. There was nothing intraabdominal. There was no evidence of appendicitis. There was no evidence of free air leaking out of the intestines, out of the colon. There was no evidence of a fluid collection to speak of, bacteria or anything like that that would require surgery. There was no indication for surgery. Plus, if we would have gone in as people would say, you know, just take a look around, this is a gentleman who is sick, and the two reasons not to do, you know, this diagnostic either laparoscopy or laparotomy, number one, heart disease, you're going to make it worse by putting them to sleep. When you put somebody under an anesthetic *** their vitals drop and that can cause a massive heart attack just inducing anesthetic without doing the surgery.

***

The other one is pulmonary, because the breathing is not going to be done spontaneously. It's going to be done with a tube down you, an endotracheal tube. Your risk of even progression of respiratory failure, going into ARDS goes up because you're going to have to put somebody under anesthetic."

¶ 22    On February 19, Kokoszka examined Stephen. Stephen, who appeared confused, had both a fever and an altered blood count. Kokoszka suspected sepsis. Sepsis would not be caused by an untreated bowel obstruction but would require a complication such as a bowel perforation. Kokoszka testified that there was no intra-abdominal pathology to account for Stephen's sepsis or drop in blood pressure. He ordered another CT scan and a hematology consult.

¶ 23    The CT scan showed a mildly enlarged appendix. The possible small bowel obstruction or ileus was gone. However, Stephen's condition continued to deteriorate with congestive heart failure, respiratory failure, renal failure, and liver failure symptoms.

¶ 24    Dr. Almusaddy (the pulmonologist critical care doctor), Dr. Gustafson (the hematologist and oncologist), and Dr. Henze (the primary care doctor covering for Dr. Jones), spoke with plaintiff about Stephen's condition. Kokoszka, Gustafson, and Henze all agreed to a recommendation for comfort measures only. Later that day, hospital personnel followed Stephen's orders to not resuscitate, not intubate, withdraw treatment, and provide comfort measures only. He died the next day.

¶ 25    Plaintiff's expert, Dr. Richard Greenberg, a general surgeon, found a small bowel obstruction in subsequent X-rays. He testified that the obstruction, accompanied by acute abdominal pain, indicated that the standard of care was to operate on Stephen. Greenberg opined that Kokoszka's failure to operate deviated from the applicable standard of care and that the deviation was a proximate cause of Stephen's injuries and death. Greenberg also testified that the spreading abdominal pain, developing fever, growing confusion, and unresolved small bowel obstruction apparent from first X-ray on February 17 to the last X-ray on February 19 were all red flags requiring surgery under the standard of care.

¶ 26       Plaintiff also presented Dr. Fred Zar, an infectious disease expert. Zar believed that Stephen had sepsis caused by a small bowel obstruction or an inflamed appendix. He did not believe that Stephen had pneumonia but was suffering from appendicitis. Zar opined that surgery was indicated but conceded that Stephen was a high-risk surgical candidate. Zar had no opinion whether Stephen could survive surgery.

¶ 27       Plaintiff also presented the testimony of Dr. Alexander Hantel, Stephen's treating physician. Hantel testified that Stephen was diagnosed with Stage IV mantle cell lymphoma in September 2008. Hantel explained that Stephen's mantle cell lymphoma was incurable. Hantel opined that as of January 2011, Stephen had a life expectancy of one to three years. No other expert testified to Stephen's life expectancy.

¶ 28       Defendants called three expert witnesses.

¶ 29       Dr. Michael Arthofer, a diagnostic radiologist, testified that, based on the February 19 CT scan, there was no evidence of any abdominal or pelvic sepsis. He opined that Stephen had radiographic evidence of pneumonia and that his lungs were a possible source of any infection.

¶ 30       Dr. Frederick Alexander, an infectious disease doctor, testified that surgery was never indicated for Stephen and that he died from multi-system organ failure. The diagnostic imaging did not show anything repairable by surgery, and none of Stephen's treating physicians ever indicated a surgical abdomen. Alexander did not believe that Stephen died of bacterial sepsis as his blood cultures were all negative. Alexander opined that pneumonia was the most likely source of infection for Stephen. There was no indication of any abdominal infection.

¶ 31       Dr. Michael Ujicki, a general surgeon, testified that there was no indication of surgery for Stephen because there was no abdominal process that surgery would fix. There was no clinical or radiographic sign of an abdominal infection and no evidence of a transition point or other cause of

obstruction. Ujicki explained that 85% of small bowel obstructions resolve by use of an NG tube as employed in this case. An ileus is never an indication for surgery.

¶ 32 According to Dr. Ujicki, surgery was contraindicated for Stephen. Ujicki opined that Kokoszka met the standard of care by not operating on Stephen. Ujicki opined that performing surgery may have breached the standard of care. Ujicki explained that Stephen was a "terrible risk for surgery." Ujicki did not "think [Stephen] would survive a surgery." Ujicki added:

"[I]t was very clear to me that the risks clearly outweighed the benefits of surgery. I feel very strongly that the surgery would have not changed the outcome and would have led to more suffering and pain due to the incisions needed for the surgery to be done. So I think it would have been wrong to do that ***."

Ultimately, Ujicki opined that Stephen died of multisystem organ failure, including kidney failure, liver injury, respiratory failure, and multiple heart failures.

¶ 33 The trial court provided the jury with Illinois Pattern Jury Instructions, Civil, No.15.01 (2011) (hereinafter IPI Civil (2011)), which advised the jury that more than one proximate cause could exist for the purpose of imposing liability. That instruction, as modified, provided:

"When I use the expression 'proximate cause,' I mean a cause that, in the natural or ordinary course of events, produced the plaintiff's injury. It need not be the only cause, nor the last or nearest cause. It is sufficient if it combines with another cause resulting in the injury."

¶ 34 The trial court refused plaintiff's proposed jury instruction of short-form IPI Civil (2011) No. 12.05, which, as modified, provided: "If you decide that the defendant was negligent and that his negligence was a proximate cause of injury to the plaintiff, it is not a defense that something else may also have been a cause of the injury." The court refused on the basis that it would provide

the jury with IPI Civil (2011) No. 15.01, which informed the jury that there could be more than one proximate cause for the injury. The trial court also refused plaintiff's proposed non-IPI instruction regarding the "lost chance" doctrine because IPI Civil (2011) No. 15.01 encompassed the concept of the "lost chance" doctrine.

¶ 35    Further, the trial court provided the jury with modified IPI Civil (2011) No. 31.13. Originally, plaintiff requested the instruction include life table data, which indicated a 10-year life expectancy for Stephen. The court refused and modified the instruction to show that Stephen had a one-to-three-year life expectancy due to plaintiff's uncontested expert witness testimony on the issue. In making this decision, the trial court relied on the decision in *Morus v. Kapusta*, 339 Ill. App. 3d 483 (2003).

¶ 36    During the jury deliberations, the jury asked the court: "We have a problem with the question—Failed to repair Stephen Szobar's small bowel obstruction that had been demonstrated by xrays [*sic*] on Feb 17, 18 and 19. Does it assume he could have fixed it?" The court ultimately told the jury that it had heard all the evidence and should continue to deliberate.

¶ 37    Ultimately, the jury returned a verdict in favor of defendants.

¶ 38                                II. ANALYSIS

¶ 39    On appeal, plaintiff challenges the trial court's jury instruction decisions. Specifically, plaintiff contends that the trial court erred in denying two of her proximate cause instructions. Additionally, plaintiff contends that the trial court erred when it provided the jury with a modified instruction as to Stephen's life expectancy.

¶ 40    In determining the propriety of the tendered instructions, this court considers whether, considering the instructions in their entirety, the jury was fairly, fully, and comprehensively informed as to the relevant principles. *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 100 (1995). The trial court has discretion in determining what issues are raised by the evidence. *Id.*; *Villa v. Crown Cork & Seal Co.*, 202 Ill. App. 3d 1082, 1088 (1990). The trial court's determination of which jury instructions should be given will not be disturbed on appeal unless that determination amounted to an abuse of discretion. *Lundquist v. Nickels*, 238 Ill. App. 3d 410, 431 (1992).

¶ 41                              A. Proximate Cause Instructions

¶ 42    Plaintiff challenges two of the trial court's decisions regarding proximate cause instructions. First, plaintiff contends that the trial court erred when it denied her request to instruct the jury on short form IPI Civil (2011) No. 12.05. The tendered instruction stated: "If you decide that the defendant was negligent and that his negligence was a proximate cause of injury to the plaintiff, it is not a defense that something else may also have been a cause of the injury." According to plaintiff, because plaintiff and defendants presented competing evidence as to the cause of Stephen's death, the jury needed to be informed that defendants need not be the sole proximate cause of Stephen's injuries. Plaintiff contends that the failure to provide this instruction "depriv[ed] the jury of the knowledge that it did not have to choose just one proximate cause of injury."

¶ 43    We find that the trial court did not abuse its discretion in denying plaintiff's request to instruct the jury on short form IPI Civil (2011) No. 12.05. The trial court provided the jury with IPI Civil (2011) No. 15.01, which states, as modified:

> "When I use the expression 'proximate cause,' I mean a cause that, in the natural or ordinary course of events, produced the plaintiff's injury. *It need not be the only cause, nor the last or nearest cause. It is sufficient if it combines with another cause resulting in the injury*." (Emphasis added.)

The plain language of the instruction demonstrates that the jury was not left to believe it was limited to only find one proximate cause for Stephen's injuries. See generally *Campbell v. Wagner*, 303 Ill. App. 3d 609, 614 (1999). In other words, IPI Civil (2011) No. 15.01 expressly informed the jury that it did not need to choose just one proximate cause of injury. Thus, providing the jury with plaintiff's IPI Civil (2011) No. 12.05 was unnecessary, given that IPI Civil (2011) No. 15.01 adequately informed the jury that it was not limited to determining a single cause for Stephen's injury. See *Doe v. Alexian Brothers Behavioral Health Hospital*, 2019 IL App (1st) 180955, ¶ 35 (noting that a given definition of proximate cause (although not cited but almost identical to IPI Civil (2011) No. 15.01) specifically allows for more than one cause of the plaintiff's injuries).

¶ 44    In reaching this conclusion, we reject plaintiff's reliance upon *Ellig v. Delnor Community Hospital*, 237 Ill. App. 3d 396 (1992). *Ellig* is distinguishable. Unlike the present case, the trial court in *Ellig* did not provide what is currently IPI Civil (2011) No. 15.01. Instead, the court only provided the short form version of Illinois Pattern Jury Instructions, Civil, No. 12.05 (3d ed. 1989) (hereinafter IPI Civil 3d), which excluded the language of sole proximate cause. *Ellig*, 237 Ill. App. 3d at 404-05.

¶ 45    We also reject plaintiff's reliance on *Holton v. Memorial Hospital*, 176 Ill. 2d 95 (1997). While the trial court in *Holton* provided IPI Civil 3d Nos. 12.05 and 15.01, the appellate court was not asked to consider whether the jury was properly informed that it could consider multiple proximate causes. *Holton*, 176 Ill. 2d at 132-33. The *Holton* court did not hold that the trial court

- 11 -

was required to provide the jury with both IPI Civil 3d No. 15.01 and short form IPI Civil 3d No. 12.05. Instead, the issue in *Holton* was whether the trial court should have provided a sole proximate cause instruction in long form IPI Civil 3d No. 12.04. *Holton*, 176 Ill. 2d at 133-34.

¶ 46 Next, plaintiff contends that the circuit court erred when it rejected her nonpattern jury instruction based on the lost chance doctrine under *Holton*, 176 Ill. 2d 95. Plaintiff's non-IPI instruction stated:

"If you decide or if you find that the plaintiff has proven that one or more of the negligent acts claimed, deprived Stephen Szobar of a chance at a better recovery or deprived him of a chance of a better outcome, you may consider such a delay in treatment a proximate cause of the damages in this case."

¶ 47 Here, the trial court refused plaintiff's offered instruction and instead provided the jury with IPI Civil (2011) No. 15.01. When the court determines that a pattern jury instruction is applicable to an issue in the case on which the jury should be instructed, the pattern instruction "shall be used, unless the court determines that it does not accurately state the law." Ill. S. Ct. R. 239(a) (eff. Apr. 8, 2013). By contrast, a nonpattern instruction may be used only if the pattern instruction does not correctly state the law or is otherwise inadequate. Illinois courts have "consistently affirmed refusals of similar proffered nonstandard [lost-chance] instructions because IPI Civil 3d No. 15.01 properly states the law in lost chance medical malpractice cases." See *Cetera v. DiFilippo*, 404 Ill. App. 3d 20, 45 (2010) (citing *Sinclair v. Berlin*, 325 Ill. App. 3d 458, 466 (2001); *Lambie v. Schneider*, 305 Ill. App. 3d 421, 429 (1999); *Henry v. McKechnie*, 298 Ill. App. 3d 268, 277 (1998)). We see no reason to deviate from these holdings. Providing the jury with IPI Civil (2011) No. 15.01 properly stated the law as to the lost-chance doctrine; the trial

court did not abuse its discretion in denying plaintiff's request to provide the jury with a non-IPI instruction.

¶ 48    In reaching this conclusion, we reject plaintiff's reliance on *Bailey v. Mercy Hospital & Medical Center*, 2020 IL App (1st) 182702. In *Bailey*, the First District found that the trial court erred in refusing plaintiff's lost-chance doctrine instruction. *Id.* ¶ 112. In that case, plaintiff was diagnosed with viral gastroenteritis during her first two admissions in the emergency room. *Id.* ¶ 109. Plaintiff's experts testified that Jill's history, symptoms, and certain tests and laboratory findings in the emergency room were consistent with toxic shock syndrome and sepsis, which ultimately caused her death. *Id.* ¶¶ 109, 111. Plaintiff was not treated with antibiotics until she was placed in the intensive care unit. *Id.* ¶ 30. Plaintiff's experts testified that a patient has a better outcome if sepsis is treated early with antibiotics. *Id.* ¶ 111. One expert specifically testified that each hour of delay from the time a patient presents sepsis to the time she receives antibiotics increases the risk of death by about 7%. *Id.* The expert further testified that plaintiff's risk of dying increased when the physicians did not diagnose her with sepsis or administer an early treatment of antibiotics. *Id.* Another expert further testified that had plaintiff received the proper course of treatment, it was more probably true than not that plaintiff would have survived. *Id.*

¶ 49    Defendant argues that *Bailey* was wrongly decided. We need not go there. We find *Bailey* distinguishable. The *Bailey* case involved an allegation that defendants' negligent delay reduced the effectiveness of later treatment. Such is not the case here. Plaintiff's theory of this case is that defendants negligently failed to perform surgery; that is, it was defendants' failure to perform surgery that proximately caused plaintiff's damages.

¶ 50    B. Damages Instructions

- 13 -

¶ 51    Lastly, plaintiff argues that the trial court erred when it provided the jury with modified IPI Civil (2011) No. 31.13 regarding Stephen's life expectancy. Plaintiff's proposed jury instruction IPI Civil (2011) No. 31.13 stated that, based on general life tables, Stephen's life expectancy was 10 years. The trial court refused the instruction based on the evidence at trial regarding Stephen's shortened life expectancy. Plaintiff's expert provided the only evidence as to Stephen's life expectancy. To that end, plaintiff's expert testified that Stephen had a life expectancy of one to three years. Therefore, the trial court provided the jury with a modified IPI Civil (2011) No. 31.13 instruction, which provided, in relevant part, "The evidence shows that Stephen Szobar was likely to live 1 to 3 years."

¶ 52    In making its decision, the trial court in this case relied on the decision in *Morus*, 339 Ill. App. 3d 483. In *Morus*, plaintiff and defendant offered two competing expert witnesses. *Id.* at 487-88. Each expert generally testified that the decedent had a life expectancy of about five years. *Id.* The trial court, therefore, provided the jury with a modified Illinois Pattern Jury Instructions, Civil, No. 31.13 (2000) (hereinafter IPI Civil (2000)) instruction, which provided that the decedent had an approximate life expectancy of five years at the time of his death. *Morus*, 339 Ill. App. 3d at 489.

¶ 53    On appeal, the appellate court found the modified instruction on life expectancy "was warranted and not in error." *Id.* at 493. According to the appellate court, life expectancy is beyond the understanding of the average lay person. *Id.* at 492, 494. As such, life expectancy required expert testimony. *Id.* The appellate court found that both plaintiff's and defendant's experts reached the same conclusion that the decedent had a five-year life expectancy. Therefore, the trial court did not abuse its discretion in providing modified IPI Civil (2000) No. 31.13, which was consistent with the expert testimony. *Morus*, 339 Ill. App. 3d at 494.

¶ 54    We agree with the reasoning in *Morus* and hold that the trial court did not abuse its discretion when it provided the jury with modified IPI Civil (2011) No. 31.13 and informed the jury that Stephen had a life expectancy of one to three years. As *Morus* explained, Stephen's life expectancy "was an issue beyond the understanding of the jury and required a medical basis couched in expert testimony." See *Morus*, 339 Ill. App. 3d at 494. In this case, the average juror could not be expected to know the impact of incurable mantle cell lymphoma on Stephen's life expectancy. Plaintiff's expert testified that Stephen's life expectancy was one to three years. Defendant did not offer an expert opinion regarding Stephen's life expectancy. This left plaintiff's expert testimony undisputed. As such, there is no factual dispute as to Stephen's life expectancy. Like the court in *Morus*, we find the trial court did not abuse its discretion in providing the jury with modified IPI Civil (2011) No. 31.13.

¶ 55                              III. CONCLUSION

¶ 56    For the foregoing reasons, we affirmed the judgment of the circuit court of Grundy County.

¶ 57    Affirmed.

---

**No. 3-20-0015**

---

| | |
|---|---|
| **Cite as:** | *Gretencord-Szobar v. Kokoszka*, 2021 IL App (3d) 200015 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Grundy County, No. 15-L-7; the Hon. Lance R. Peterson, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Robert J. Napleton, Brion W. Doherty, and David J. Gallagher, of Motherway & Napleton, LLP, of Chicago, and Lynn D. Dowd, of Naperville, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Melinda S. Kollross and Paul V. Esposito, of Clausen Miller, P.C., of Chicago, and Robert R. Gorbold, of Kavanaugh, Grumley & Gorbold, of Joliet, for appellees. |

---