**2021 IL 126748**


# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 126748)

JILL M. BAILEY, Appellee, v. MERCY HOSPITAL AND
MEDICAL CENTER *et al.* (Scott A. Heinrich, M.D., *et al.*, Appellants).


*Opinion filed November 18, 2021.*


JUSTICE CARTER delivered the judgment of the court, with opinion.

Chief Justice Anne M. Burke and Justices Garman, Theis, Neville, Michael J. Burke, and Overstreet concurred in the judgment and opinion.


**OPINION**

¶ 1        This appeal asks whether the circuit court abused its discretion and denied plaintiff a fair trial by refusing to issue a nonpattern jury instruction on the loss of chance doctrine and a pattern jury instruction on informed consent in the underlying wrongful death and medical malpractice action. The appellate court answered that question in the affirmative, reversed the circuit court's judgment in part, and

remanded for a new trial against certain defendants. 2020 IL App (1st) 182702. For the reasons that follow, we reverse in part the appellate court's judgment. We affirm the circuit court's judgment in its entirety.

¶ 2                                    I. BACKGROUND

¶ 3        Plaintiff, Jill M. Bailey, the independent administrator of the estate of Jill M. Milton-Hampton, deceased, filed a medical malpractice action in the circuit court of Cook County against defendants Mercy Hospital and Medical Center (Mercy); Scott A. Heinrich, M.D.; Brett M. Jones, M.D.; Amit Arwindekar, M.D.; Helene Connolly, M.D.; Tara Anderson, RN; and Emergency Medicine Physicians of Chicago, LLC (EMP).

¶ 4        Plaintiff's action arose from Jill's death on March 18, 2012, two days after she sought treatment at Mercy's emergency department. The action raised claims for wrongful death and medical negligence. Ultimately, the matter proceeded to a jury trial.

¶ 5        At trial, the evidence demonstrated that Jill arrived at Mercy's emergency department at about 6:45 p.m. on March 16, 2012. Jill, who was 42 years old, was evaluated by a triage nurse and complained of abdominal pain, nausea, vomiting, and diarrhea. Jill reported that she had recently recovered from a flu-like illness that caused a sore throat, chills, and fever, and she had been suffering from abdominal pain for four days. The triage nurse noted that Jill had tachycardia, or an elevated heart rate. Jill did not have a fever, and her respiratory rate was normal. A triage physician ordered a comprehensive metabolic panel (CMP) and a urinalysis.

¶ 6        Dr. Heinrich evaluated Jill in Mercy's main emergency department, where Jill continued to report nausea, vomiting, diarrhea, and abdominal pain. Jill did not have a fever, chest pain, or shortness of breath, but her heart rate was elevated at 124 beats per minute. The normal resting heart rate for a woman Jill's age was between 60 and 100. The results of Jill's CMP revealed that her glucose, liver function, and kidney function were all normal. Jill's levels of sodium and chloride were low but consistent with a patient who was dehydrated.

¶ 7        Dr. Heinrich ordered a hemoglobin and hematocrit test to determine whether Jill was anemic. The results showed that Jill's hemoglobin level was 7.5, which was low and outside the normal parameter of 12 to 15 mg/dl. One potential cause of Jill's low hemoglobin was chronic anemia caused by Jill's current menstruation and history of heavy periods. To treat Jill's dehydration, Dr. Heinrich ordered three bags of intravenous fluids and also ordered medicine for her nausea, epigastric discomfort, and pain. At about 3:30 a.m., Dr. Heinrich evaluated Jill and prepared a note to transfer her care to Dr. Jones.

¶ 8        In his note, Dr. Heinrich indicated that Jill continued to complain of nausea but also reported improvement in her symptoms. Dr. Heinrich suspected that Jill's low blood counts were likely caused by menstruation. Although Dr. Heinrich did not have a definitive diagnosis, he believed that Jill had viral gastroenteritis, also referred to as stomach flu. Dr. Heinrich's conclusion was based on his physical examination of Jill, her symptoms, the results of her tests, and the fact that Jill reported improvement after receiving fluids. Dr. Heinrich did not suspect sepsis or toxic shock syndrome because Jill did not have a fever or rash, which were the typical signs of toxic shock syndrome.

¶ 9        After Jill was transferred to Dr. Jones's care, the doctors discussed Jill's history, her test results, and the "running diagnosis" of viral gastroenteritis. Jill received a third bag of fluids while under Dr. Jones's care and he planned to observe her progress. Dr. Jones reviewed the results of Jill's urinalysis, which were negative for a urinary tract infection and showed no signs of dehydration. After Jill received the fluids, she stated that she felt better. Based on Jill's lab results and response to fluids, Dr. Jones believed that she had viral gastroenteritis.

¶ 10        At 6 a.m. on March 17, Dr. Jones evaluated Jill, and he recommended admission to the hospital for observation and further testing. Jill, however, declined admission. Dr. Jones prepared a discharge note that provided:

> "I did see and evaluate [Jill]. She continues to be nauseated. I recommended further observation and admission, especially given her persistent tachycardia, abnormal laboratory studies, however, the patient declines this and would really like to go home. [Jill] does demonstrate decisional capacity. *** She agrees to return to the ER for worsening symptoms, severe pain, or for any other

concerns. Her partner is with her, appears to be reliable[,] and will bring her back for worsening pain."

Dr. Jones testified that, before Jill left the hospital, he discussed the risks of leaving the hospital, including his concern that Jill had gastroenteritis and an elevated heart rate. Dr. Jones told Jill there were "multiple possibilities that [Jill's condition] could be[,] many of which are very, very serious." Dr. Jones told Jill he wanted her to return to the hospital if she experienced worsening symptoms.

¶ 11        Dr. Jones acknowledged that he was concerned with Jill's persistent elevated heart rate, which could indicate a pulmonary embolism, gastrointestinal bleeding, or an infection. Dr. Jones did not order any additional testing while he cared for Jill. Dr. Jones did not tell Jill he was concerned about gastrointestinal bleeding or sepsis, and he could not recall if he ever told Jill that she may have a life-threatening condition before she was discharged from Mercy.

¶ 12        After Jill's discharge on March 17, 2012, Dr. Heinrich returned to the hospital. Dr. Heinrich reviewed Jill's chart and learned that she was discharged after she declined admission to the hospital. Dr. Heinrich called Jill and spoke with her ex-husband, who stated that Jill had not improved and planned to return to Mercy.

¶ 13        Dr. Heinrich then called Dr. Connolly, the triage physician in Mercy's emergency department, and told her that Jill was previously at Mercy with abdominal pain and was returning with symptoms of nausea, vomiting, and diarrhea. Dr. Heinrich advised Dr. Connolly that she should order a computed tomography (CT) scan of Jill's abdomen.

¶ 14        Jill returned to Mercy's emergency department at 5:49 p.m. on March 17, 2012. When Dr. Connolly saw Jill's name appear in the computer system, she ordered an abdominal CT, a complete blood count (CBC), and a CMP. Dr. Connolly did not personally evaluate Jill, participate in her triage, or review her records.

¶ 15        A triage nurse evaluated Jill and recorded that Jill complained of cough, vomiting, diarrhea, shortness of breath, and chest pain. Jill's heart rate was elevated at 116, and her blood pressure was 90/53, which was low for diastolic blood pressure. Jill's respiratory rate was 20, and her skin was warm and dry. The triage nurse did not believe that Jill had an immediate cardiac need and thought Jill could

remain in the waiting room until a hospital bed was available. The triage nurse did not contact Dr. Connolly with any concerns about Jill.

¶ 16    Approximately four hours later, at about 9:40 p.m., Jill was transferred to Mercy's main emergency department and evaluated by emergency room nurse Tara Anderson. Anderson's initial assessment note indicated that Jill was alert and oriented and had symptoms of vomiting and cramping. Jill's skin was warm and dry, and her respiratory pattern was normal. Jill did not complain of chest pain or shortness of breath.

¶ 17    Dr. Arwindekar and Marco Rodriguez, an emergency medicine resident, cared for Jill in the main emergency department. Jill continued to report symptoms of nausea, vomiting, and diarrhea. Jill had an elevated heart rate, her respiratory rate was normal, and she was alert and oriented.

¶ 18    Jill did not have a fever and did not report chest pain or shortness of breath to Dr. Arwindekar. Jill did not have blood in her urine or pain with urination, the typical symptoms of an infection. Jill also did not have any skin rashes. According to Dr. Arwindekar, Jill's white blood cell count was minimally elevated at 12.2, potentially caused by stress, infection, injury, or dehydration. The neutrophils in Jill's blood were not elevated, which suggested Jill did not have an acute infection. Jill's hemoglobin level was 7.2, which was lower than her prior result and was consistent with chronic anemia.

¶ 19    Shortly after 10 p.m., Rodriguez ordered intravenous fluids, pain and nausea medication, and a chest X-ray. When Rodriguez's shift ended at midnight, he reexamined Jill before transferring her care to Dr. Arwindekar. In his note, Rodriguez observed that Jill stated that her pain and nausea had improved and her condition was stable. Rodriguez believed that Jill had a viral infection and did not suspect that she had sepsis.

¶ 20    At about 12:50 a.m. on March 18, 2012, Jill had an abdominal CT scan, which indicated a "heterogenous density" in Jill's vaginal area that "should be correlated clinically." According to Dr. Arwindekar, the "heterogenous density" indicated that Jill had blood clots in her vagina, consistent with a menstruating woman. Dr. Arwindekar did not believe the CT scan indicated the presence of a tampon, but he did not determine whether Jill was using a tampon.

¶ 21        Around 2 a.m., nurse Anderson documented that Jill's pulse, blood pressure, temperature, and respiration were normal. About 30 minutes later, around 2:37 a.m., Dr. Arwindekar placed an order to transfer Jill to the observation unit that was used for patients expected to be discharged within 24 to 48 hours. At that time, Jill still felt nauseous and had diarrhea. However, Jill's elevated heart rate had improved, her vital signs were normal, her condition was stable, and she did not have a fever. Based on this information, Dr. Arwindekar believed that Jill's condition was consistent with viral gastroenteritis.

¶ 22        At 4:30 a.m., Jill was transferred to the observation unit in stable condition with normal vital signs. About an hour later, however, at 5:50 a.m., Jill went into cardiopulmonary arrest. Jill was intubated and resuscitated, and then transferred to the intensive care unit. While in the ICU, Jill suffered a successive series of cardiac arrests and ultimately died at 11:30 a.m. on March 18.

¶ 23        A subsequent postmortem examination by Cook County medical examiner Lauren Woertz indicated that Jill died from myocarditis resulting from sepsis. Woertz's report indicated that Jill's blood cultures showed that methicillin-resistant staphylococcus aureus (MRSA) bacteria was present in Jill's blood.

¶ 24        At the request of Jill's family, James Bryant performed a second autopsy on Jill. He concluded that Jill's cause of death was acute and chronic congestive heart failure due to dilated cardiomyopathy. Bryant's report did not indicate that Jill had myocarditis or sepsis.

¶ 25        At trial, the parties disagreed on Jill's cause of death. Plaintiff argued that Jill died of toxic shock syndrome and sepsis caused by a retained tampon, which could have been treated by antibiotics if timely diagnosed by defendants. Plaintiff presented several medical experts to support her theory of Jill's death. Generally, those experts testified that sepsis is caused by an untreated infection that can cause inflammation, an elevated heart rate, damage to organs, and pain. MRSA is a common bacterial pathogen that can cause toxic shock syndrome and result from tampon use. Plaintiff's experts testified that the "heterogenous density" observed in Jill's abdominal CT report was a tampon. Woertz's postmortem report also indicated that MRSA grew from Jill's blood cultures, supporting the theory that Jill had an untreated bacterial infection that resulted in sepsis.

¶ 26　　Plaintiff's experts further testified that Jill had several symptoms consistent with sepsis, including a sore throat, chills, abdominal pain, and vomiting. Although Jill did not have the common symptoms of sepsis, such as a fever or rash, when she presented at Mercy's emergency room, plaintiff's medical expert testified that those symptoms could have resolved prior to Jill's admission, as she had been sick for several preceding days.

¶ 27　　Plaintiff's experts asserted that defendants should have considered toxic shock syndrome and sepsis because Jill was menstruating and because toxic shock can be caused by bacteria from a tampon. Before Jill was allowed to leave Mercy during her discharge, defendants should have performed additional testing and then informed Jill that she had a bacterial infection that could cause death without antibiotic treatment. According to plaintiff's medical experts, defendants deviated from the standard of care for someone in Jill's condition, and Jill would have survived if she received the proper information and treatment, including an antibiotic, for sepsis.

¶ 28　　In contrast, defendants argued that Jill died of acute viral myocarditis, which could not be treated with antibiotics. Defendants presented several medical experts to support their theory. Those experts testified that there was no evidence of bacterial infection found during Jill's autopsy and no identified infection site in Jill's body. Defendants' experts testified that Jill's abdominal CT did not indicate the presence of a tampon or that Jill had a life-threatening condition. Similarly, Jill's autopsy did not indicate the presence of a tampon.

¶ 29　　Although a postmortem blood sample tested positive for MRSA, defendants' experts asserted that it was the result of contamination introduced during the resuscitation attempts when several medical lines were inserted into Jill's body. Jill's blood work did not indicate a patient with a systemic bacterial infection, and Jill's kidneys were functioning properly. Jill's autopsy reports did not show evidence of bacterial infection, which would have been present if Jill had toxic shock syndrome or bacterial sepsis.

¶ 30　　One of defendants' medical experts testified that the Centers for Disease Control symptoms for toxic shock syndrome included a documented fever of 102 degrees or greater, a skin rash, desquamation (shedding of skin layers), low blood pressure, and multisystem organ failure. Jill had two isolated blood pressure

readings below normal levels but none of the other diagnostic symptoms for toxic shock syndrome. In addition, Jill's autopsy did not indicate that she suffered from multisystem organ failure.

¶ 31    Defendants' medical experts opined that Jill died from a fulminant viral myocarditis, which is a progressive condition that causes acute heart damage. Jill's symptoms at the hospital were consistent with viral gastroenteritis, which is a preceding viral illness that may be associated with myocarditis. Defendants' experts testified that nothing that defendants did, or failed to do, contributed to Jill's death. Instead, defendants' care met the applicable standard of care.

¶ 32    Ultimately, the jury returned a verdict against plaintiff and in favor of all defendants. The circuit court entered a judgment consistent with the jury's verdict.

¶ 33    On direct appeal, plaintiff argued that the trial court denied her a right to a fair trial and abused its discretion when it refused to give three jury instructions she requested: (1) Illinois Pattern Jury Instructions, Civil, No. 105.07.01 (2011) (hereinafter IPI Civil No. 105.07.01), the instruction on informed consent; (2) Illinois Pattern Jury Instructions, Civil, No. 5.01 (2011) (hereinafter IPI Civil No. 5.01), the instruction relating to missing evidence or witnesses, and (3) a nonpattern jury instruction on the loss of chance doctrine. Plaintiff also challenged the trial court's ruling to allow the testimony of one of defendant's medical experts and a demonstrative exhibit. Last, plaintiff argued that the jury's verdict was against the manifest weight of the evidence. 2020 IL App (1st) 182702, ¶ 80.

¶ 34    In relevant part, the appellate court agreed with plaintiff that the trial court abused its discretion and denied her a fair trial when it refused to issue a pattern jury instruction on informed consent and, instead, issued a one-line instruction on informed consent. The appellate court reasoned that the circuit court's instruction "was an inaccurate statement of the applicable law" and "did not explain the elements of informed consent, including Dr. Jones's duty to disclose material risks" before Jill left the hospital. *Id.* ¶ 97. The appellate court rejected defendants' contention that an informed consent instruction is limited to instances when a medical procedure or test is performed because defendants did not cite any caselaw to support that proposition. *Id.* ¶ 98.

¶ 35    The appellate court also agreed with plaintiff's contention that the circuit court denied her a right to a fair trial by refusing to give her proposed nonpattern jury instruction on the loss of chance doctrine and by only giving the long-form proximate causation instruction based on IPI Civil No. 15.01. *Id.* ¶ 112. The appellate court acknowledged that its decision conflicted with *Cetera v. DiFilippo*, 404 Ill. App. 3d 20, 45 (2010), and other decisions affirming a trial court's refusal to issue a nonpattern instruction on loss of chance when the jury is instructed on proximate cause by IPI (Civil) No. 15.01. 2020 IL App (1st) 182702, ¶ 113.

¶ 36    The appellate court reasoned that

"[i]f we continue to follow *Cetera* and the cases that have found no error where a trial court gives IPI Civil No. 15.01 and refuses to give a nonpattern instruction on the loss of chance, a plaintiff may never be able to submit an instruction explaining a loss of chance theory to the jury." *Id.* ¶ 114.

The court further found that the instruction on proximate cause in IPI Civil No. 15.01 was insufficient because it did not specifically instruct "that the jury may consider, as a proximate cause of a patient's injury, that a defendant's negligence lessened the effectiveness of the treatment or increased the risk of an unfavorable outcome to a patient." *Id.* ¶ 115.

¶ 37    The appellate court rejected, or declined to consider, the remainder of plaintiff's arguments. *Id.* ¶¶ 105, 124, 131, 134-35. Ultimately, the court concluded as follows:

"The trial court erred when it refused to give plaintiff's proposed instruction on informed consent based on IPI Civil No. 105.07.01 and when it refused to give plaintiff's nonpattern instruction on the loss of chance doctrine. We reverse the jury's verdict finding against plaintiff and in favor of defendants Brett Jones, Scott Heinrich, Amit Arwindekar, Helene Connolly, and Emergency Medicine Physicians of Chicago, and remand for a new trial with respect to these defendants. We affirm the jury's verdict finding in favor of defendant Tara Anderson and Mercy Hospital and Medical Center and against plaintiff." *Id.* ¶ 137.

¶ 38    We allowed defendants' petition for leave to appeal pursuant to Illinois Supreme Court Rule 315 (eff. Oct. 1, 2020). The Illinois State Medical Society and American Medical Association were granted leave to file an *amicus curiae* brief in support of defendants' position. Ill. S. Ct. R. 345 (eff. Sept. 20, 2010). The Illinois Trial Lawyers Association was granted leave to file an *amicus curiae* brief in support of plaintiff's position. *Id.*

¶ 39                                          II. ANALYSIS

¶ 40    On appeal, defendants challenge the appellate court's determination that the circuit court committed reversible error that warrants a new trial by refusing plaintiff's request for two jury instructions: (1) a nonpattern jury instruction on the loss of chance doctrine and (2) a pattern jury instruction on informed consent. Alternatively, if this court determines a new trial is warranted, defendants request that this court clarify the proposed jury instructions and proper parties for the new trial.

¶ 41    This court recognizes that civil litigants are entitled to have the jury instructed on the issues presented, the applicable legal principles, and the facts that must be proved to support a verdict. *Dillon v. Evanston Hospital*, 199 Ill. 2d 483, 505 (2002). "While the threshold for permitting an instruction in a civil case is modest, the standard for reversing a judgment based on failure to permit an instruction is high. The decision as to which jury instructions to use falls within the discretion of the trial court." *Heastie v. Roberts*, 226 Ill. 2d 515, 543 (2007).

¶ 42    Thus, we generally review a trial court's decision to grant or deny a jury instruction for an abuse of discretion. *Studt v. Sherman Health Systems*, 2011 IL 108182, ¶ 13. " 'The standard for determining an abuse of discretion is whether, taken as a whole, the instructions are sufficiently clear so as not to mislead and whether they fairly and correctly state the law.' " *Id.* (quoting *Dillon*, 199 Ill. 2d at 505). This court reviews *de novo* the legal question of whether the instruction accurately conveyed the applicable law. *Id.* (citing *Barth v. State Farm Fire & Casualty Co.*, 228 Ill. 2d 163, 170 (2008)). Ultimately, a reviewing court should grant a new trial only when the trial court's refusal to give a tendered jury instruction results in serious prejudice to the party's right to a fair trial. *Heastie*,

226 Ill. 2d at 543.

¶ 43                   A. Nonpattern Jury Instruction on Loss of Chance Doctrine

¶ 44      Defendants first argue that the appellate court erred in concluding that the circuit court denied plaintiff a fair trial when it refused to give her proposed nonpattern jury instruction on the loss of chance doctrine. Plaintiff's proposed nonpattern jury instruction on loss of chance provided as follows:

> "If you decide or if you find that the plaintiff has proven that a negligent delay in the diagnosis and treatment of sepsis in Jill Milton-Hampton lessened the effectiveness of the medical services which she received, you may consider such delay one of the proximate causes of her claimed injuries and death."

¶ 45      Defendants contend that the appellate court's determination that this instruction should have been given to the jury is based on the court's erroneous determination that the loss of chance doctrine is a distinct theory of causation from traditional proximate cause principles addressed in pattern jury instruction IPI Civil No. 15.01, which was given to the jury in this case.

¶ 46      According to defendants, the appellate court's decision is inconsistent with this court's decision in *Holton v. Memorial Hospital*, 176 Ill. 2d 95 (1997), when this court recognized the loss of chance doctrine and harmonized it with traditional concepts of proximate cause. Defendants further assert that the appellate court's decision contradicts other published decisions that found a nonpattern jury instruction on the loss of chance doctrine is not required to ensure a fair trial.

¶ 47      Plaintiff responds that the appellate court correctly held that she was denied a fair trial when the jury was not properly instructed on the loss of chance doctrine by her proposed nonpattern jury instruction. Citing this court's recognition of the loss of chance doctrine in *Holton*, plaintiff argues that she was entitled to seek damages to the extent Jill's chance of recovery or survival was lessened by the defendants' alleged malpractice. Her proposed nonpattern instruction properly stated the relevant principles of law for a loss of chance claim, informed the jurors of the issue presented, and was supported by the facts presented through her evidence.

¶ 48    Plaintiff disagrees with defendants' assertion that the pattern instruction on proximate cause in IPI Civil No. 15.01 was sufficient to inform the jury because it fails to instruct the jury completely and accurately on the law for loss of chance. Specifically, plaintiff contends that IPI Civil No. 15.01 "does not explain the elements of the loss of chance doctrine and how it fits into the overall scheme of damages."

¶ 49    To address the parties' dispute on this issue, we first consider our decision in *Holton* that analyzed the loss of chance doctrine under Illinois law. As we observed in *Holton*,

> " '[l]ost chance' or 'loss of chance' in medical malpractice actions refers to the injury sustained by a plaintiff whose medical providers are alleged to have negligently deprived the plaintiff of a chance to survive or recover from a health problem, or where the malpractice has lessened the effectiveness of treatment or increased the risk of an unfavorable outcome to the plaintiff." *Id.* at 111.

In 1997, the time of our decision in *Holton*, there was disagreement in Illinois law on whether the loss of chance doctrine relaxed the traditional proximate cause standard in medical malpractice actions or whether the doctrine could be satisfied by, and harmonized with, traditional principles of proximate cause. *Id.* at 112-13.

¶ 50    After analyzing several decisions from the appellate court, this court held in *Holton* that "the loss of chance concept, when properly analyzed, does not relax or lower plaintiffs' burden of proving causation" for purposes of Illinois law. *Id.* at 120. Instead, we concluded that the loss of chance doctrine comports with the traditional proximate cause standard articulated in *Borowski v. Von Solbrig*, 60 Ill. 2d 418 (1975), which requires a plaintiff to prove that defendant's negligence " 'more probably than not' " caused plaintiff's injury. *Holton*, 176 Ill. 2d at 107, 120.

¶ 51    Following *Holton*, our appellate court has repeatedly concluded that a trial court does not deny the plaintiff a fair trial when it refuses to issue a nonpattern jury instruction on the loss of chance doctrine. *Cetera*, 404 Ill. App. 3d at 45; *Sinclair v. Berlin*, 325 Ill. App. 3d 458, 466-67 (2001); *Lambie v. Schneider*, 305 Ill. App. 3d 421, 428-29 (1999); *Henry v. McKechnie*, 298 Ill. App. 3d 268, 277 (1998).

¶ 52    *Sinclair* is representative of the general reasoning applied in these cases to find a nonpattern jury instruction on the loss of chance doctrine is not required to accurately inform the jury of the applicable law and ensure a fair trial. As the appellate court in *Sinclair* explained, "lost chance is not a separate theory of recovery but rather a concept that enters into proximate cause analysis in medical malpractice cases when a plaintiff alleges a defendant's negligent delay in diagnosis or treatment has lessened the effectiveness of treatment." *Sinclair*, 325 Ill. App. 3d at 466. Moreover, "[a]lthough Sinclair's proposed lost chance instruction may be an accurate statement of law, the trial court is required by Supreme Court Rule 239(a) (134 Ill. 2d R. 239(a)) to use the IPI instruction whenever it is applicable." *Id.*

¶ 53    Because the trial court in *Sinclair* issued the proximate cause pattern jury instruction found in IPI Civil No. 15.01, the appellate court in *Sinclair* concluded that "[t]he lost chance doctrine, as a form of proximate cause, was encompassed within the instruction given to the jury." *Id.* at 467. The appellate court also observed that plaintiff's counsel advanced her loss of chance claim to the jury. Accordingly, *Sinclair* concluded that, when the jury is instructed on proximate cause by a pattern jury instruction such as IPI Civil No. 15.01, the trial court's refusal to provide a separate nonpattern jury instruction on loss of chance does not deny the plaintiff a fair trial. *Id.*

¶ 54    More recently, in *Cetera*, the appellate court adhered to *Sinclair*'s rationale and holding. *Cetera* observed that appellate court decisions consistently affirm a trial court's refusal to issue a nonpattern instruction on loss of chance "because IPI Civil 3d No. 15.01 properly states the law in lost chance medical malpractice cases." *Cetera*, 404 Ill. App. 3d at 45; see also *Gretencord-Szobar v. Kokoszka*, 2021 IL App (3d) 200015, ¶ 47 (declining to follow the appellate court decision presently under review and, instead, following *Cetera* when IPI Civil No. 15.01 is provided to the jury).

¶ 55    Here, however, the appellate court rejected this uniform precedent to conclude that the circuit court denied plaintiff a fair trial when it refused her nonpattern instruction on the loss of chance doctrine even when the jury was provided pattern jury instruction IPI Civil No. 15.01 on proximate cause. 2020 IL App (1st) 182702, ¶ 108. According to the appellate court in this case, IPI Civil No. 15.01 is

inadequate because it "does not distinctly inform the jury about loss of chance, *i.e.*, that the jury may consider, as a proximate cause of a patient's injury, that a defendant's negligence lessened the effectiveness of the treatment or increased the risk of an unfavorable outcome to a plaintiff." *Id.* ¶ 115. We disagree.

¶ 56      Our decision in *Holton* held that the loss of chance doctrine "comports," or is consistent with, traditional concepts of proximate cause and does not relax, lower, or otherwise alter a plaintiff's burden of proving causation. *Holton*, 176 Ill. 2d at 120. Contrary to the appellate court's suggestion, causation for purposes of the loss of chance doctrine is not distinct from traditional concepts of proximate cause under *Holton*. Consequently, when, as here, a jury is properly instructed on proximate cause principles by IPI Civil No. 15.01, a separate nonpattern jury instruction on loss of chance is not needed to accurately instruct the jury.

¶ 57      Accordingly, we conclude that the circuit court did not abuse its discretion or deny plaintiff a fair trial when it refused to issue a nonpattern jury instruction on loss of chance in this case. As the appellate court correctly concluded in *Sinclair*, when a jury is instructed on proximate cause through a pattern jury instruction, "[t]he lost chance doctrine, as a form of proximate cause, [is] encompassed within the instruction given to the jury," and the circuit court's refusal to give a separate nonpattern instruction on loss of chance does not deny the plaintiff a fair trial. *Sinclair*, 325 Ill. App. 3d at 467.

¶ 58                       B. Pattern Jury Instruction on Informed Consent

¶ 59      We next consider defendants' argument that the appellate court also erred when it concluded that a new trial was warranted because the circuit court refused to issue plaintiff's requested instruction on informed consent modeled on pattern jury instruction IPI Civil No. 105.07.01.[1] Plaintiff's proposed instruction on informed consent provided as follows:

_____

[1]Defendants note that, although plaintiff, the circuit court, and appellate court all referenced the informed consent instruction from IPI Civil No. 105.07.01, it appears that plaintiff's suggested question was predicated on the pattern jury instruction from IPI Civil No. 105.07.02. Our analysis focuses on the actual language of plaintiff's proposed instruction, which the parties agree was based on a pattern jury instruction.

"The plaintiff claims that the defendant, Brett Jones, M.D. failed to inform Jill Milton-Hampton of the risks associated with pulmonary embolism, gastrointestinal bleed, infection and sepsis prior to being discharged the morning of March 17, 2012, which a reasonably careful emergency medicine physician would have disclosed under the same or similar circumstances;

The plaintiff further claims that if the defendant had disclosed those risks, a reasonable person in Jill Milton-Hampton's position would not have left the hospital the morning of March 17, 2012; and

The plaintiff further claims that Jill Milton-Hampton was injured, and that the defendant's failure to disclose the aforementioned risks was a proximate cause of her injury.

The defendant denies that he failed to inform the plaintiff of those risks which a reasonably careful emergency medicine physician would have disclosed under the same or similar circumstances; denies that Jill Milton-Hampton was injured and denied any failure to disclose risks was a proximate cause of any harm or injury."

The circuit court refused to issue that instruction but allowed plaintiff to "add a line item in the issues instruction to talk about informed consent." In accordance with the circuit court's ruling, the jury was instructed, in relevant part, that "plaintiff claims that Jill was injured and sustained damage, and that the defendants were negligent in one or more of the following respects: *** Dr. Brett Jones failed to inform Jill of the risks of leaving the hospital."

¶ 60    Here, defendants argue that plaintiff's proposed instruction on informed consent was properly refused by the circuit court because her action did not constitute an informed consent claim. Defendants contend that an informed consent theory of liability is limited to cases when a patient gives consent to a medical treatment or procedure without being appropriately informed of the risks of that treatment or procedure, which was not present in this case.

¶ 61    Plaintiff responds that her proposed instruction on informed consent should have been given because, as the appellate court determined, the circuit court's issuance of a single-line instruction on Dr. Jones's duty to inform Jill of the risks

of leaving the hospital "was an inaccurate statement of law" and "did not explain the elements of informed consent, including Dr. Jones's duty to disclose material risks." 2020 IL App (1st) 182702, ¶ 97. Citing this court's decision in *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 273 (2002), plaintiff contends that a trial court must use an Illinois Pattern Jury instruction when it is applicable. Plaintiff contends, therefore, that the circuit court was required to use her proposed informed consent instruction modeled on an Illinois pattern jury instruction.

¶ 62　　　　We agree with defendants that the circuit court properly determined that a pattern jury instruction on informed consent was not required in this case. Illinois law recognizes

> "four essential elements a plaintiff must prove in a malpractice action based upon the doctrine of informed consent: '(1) the physician had a duty to disclose material risks; (2) he failed to disclose or inadequately disclosed those risks; (3) as a direct and proximate result of the failure to disclose, the patient consented to treatment she otherwise would not have consented to; and (4) plaintiff was injured by the proposed treatment.' " *Davis v. Kraff*, 405 Ill. App. 3d 20, 28-29 (2010) (quoting *Coryell v. Smith*, 274 Ill. App. 3d 543, 546 (1995)).

¶ 63　　　　Here, plaintiff has never alleged or presented any evidence on the third and fourth elements of an informed consent claim—that Jill consented to medical treatment without being adequately informed and that the treatment injured her. Similarly, plaintiff's proposed jury instruction did not identify any treatment Jill received or any injury she received from that treatment. Instead, plaintiff effectively advances an inverse theory of informed consent by arguing that defendants are liable for *not* performing additional medical treatment on Jill before she left the hospital. Plaintiff cites no authority recognizing those allegations as a legally valid claim under the doctrine of informed consent.

¶ 64　　　　We also note that the circuit court instructed the jury that "plaintiff claims that Jill was injured and sustained damage, and that the defendants were negligent in one or more of the following respects: *** Dr. Brett Jones failed to inform Jill of the risks of leaving the hospital." In our view, this instruction accurately informed the jury of plaintiff's allegations regarding Dr. Jones's alleged failure to adequately

warn Jill of the risks of leaving the hospital. No additional instruction on informed consent was warranted because, as explained above, plaintiff did not allege or present evidence supporting a claim of lack of informed consent. Accordingly, we conclude that the circuit court did not abuse its discretion or deny plaintiff a fair trial when it refused to issue her proposed instruction on informed consent.

¶ 65                                    III. CONCLUSION

¶ 66        Because the circuit court did not abuse its discretion or deny plaintiff a fair trial when it refused to issue her proposed nonpattern jury instruction on loss of chance and pattern jury instruction on informed consent, we reject the appellate court's conclusion that a new trial was warranted in this case. We reverse the part of the appellate court's judgment that remanded for a new trial. We affirm the judgment of the circuit court in its entirety.

¶ 67        Appellate court judgment affirmed in part and reversed in part.

¶ 68        Circuit court judgment affirmed.